ORIGINAL

JEFFERSON B. SESSIONS III
United States Attorney General
ADAM L. BRAVERMAN
United States Attorney
MICHAEL G. WHEAT, CBN 118598
ERIC J. BESTE, CBN 226089
JANAKI S. GANDHI, CBN 272246
COLIN M. MCDONALD, CBN 286561
Special Attorneys to the Attorney General
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: 619-546-8437/6695/8817/9144
Email: michael.wheat@usdoj.gov

Attorneys for the United States

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 2 2 2018

at ____ o'clock and ____ min. ____ M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>KATHERINE P. KEALOHA (1),<br>  *aka Katherine E. Kealoha,*<br>  *aka Kathy Kealoha,*<br>  *aka Kat,*<br>  *aka Alison Lee Wong*,<br>LOUIS M. KEALOHA (2),<br>DEREK WAYNE HAHN (3),<br>MINH-HUNG NGUYEN (4),<br>  *aka Bobby Nguyen*,<br>GORDON SHIRAISHI (5), and<br>DANIEL SELLERS (6),<br><br>             Defendants. | Case No <u>17CR0582-JMS-RLP</u><br><br>FIRST SUPERSEDING<br>INDICTMENT<br><br>Title 18, U.S.C., Section 371 – Conspiracy to Commit Offenses; Title 18, U.S.C., Section 1512(c) – Obstruction of Official Proceeding; Title 18, U.S.C., Section 1001 – False Statements to Federal Officer; Title 18, U.S.C., Section 1344 – Bank Fraud; Title 18, U.S.C., Section 1028A – Aggravated Identity Theft; Title 18, U.S.C., Section 982(a)(2)(A) – Criminal Forfeiture. |

The Grand Jury charges, at all times material:

## INTRODUCTORY ALLEGATIONS

1.      Defendant KATHERINE P. KEALOHA (1) ("K. KEALOHA") was an attorney licensed to practice in the State of Hawaii.  From 1993 to 2001, K. KEALOHA worked in the Department of the Prosecuting Attorney ("DPA") for the City and County of Honolulu, first as an intern, and later as a Deputy Prosecuting Attorney. From 2001 to 2006, K. KEALOHA was a solo practitioner in Honolulu, practicing criminal defense, personal injury, and family law.    In 2006, K. KEALOHA returned to work as a Deputy Prosecuting Attorney for the DPA.  In 2008, she was appointed the Director of the Office of Environmental and Quality Control for the State of Hawaii.  In 2010, K. KEALOHA again returned to the DPA as a Deputy Prosecuting Attorney, ultimately becoming a supervisor in the office.

2.      Defendant LOUIS M. KEALOHA (2) ("L. KEALOHA"), the husband of K. KEALOHA, was an officer in the Honolulu Police Department ("HPD") for over 30 years.  L. KEALOHA had an undergraduate degree in criminal justice and business administration, a graduate degree in criminal justice, and a doctorate degree in education from the University of Southern California.  During his career with HPD, L. KEALOHA rose through the ranks and, ultimately, was selected in 2009 as HPD's Chief of Police.

3.      HPD was the largest police department in the State of Hawaii, and was responsible for providing law enforcement to almost one million residents on the

2

island of Oahu. The unit of HPD responsible for investigating criminal offenses and assisting in their prosecution was the Criminal Investigation Division ("CID"). A separate, federally-authorized and specialized unit of HPD called the Criminal Intelligence Unit ("CIU") was responsible for gathering intelligence and data on organized crime, terrorism, and gang threats facing the City and County of Honolulu. The members of CIU did not collect evidence to be used in the investigation and prosecution of criminal cases, but instead, passed intelligence information about criminal threats to other units in HPD and federal law enforcement partners. Because of their specialized duties and responsibilities, officers in CIU were supervised by a lieutenant, who reported to a captain, who ultimately reported to the Chief of Police, which from 2009 to 2017 was L. KEALOHA. Due to that close relationship, the Chief of Police played a direct role in selecting and appointing officers to CIU.

4.     Defendant DEREK WAYNE HAHN (3) ("HAHN") joined HPD as a police officer in 1997, and held a variety of positions on the force. In 2013, at L. KEALOHA's suggestion, HAHN was appointed as lieutenant in CIU. HAHN was elevated to Acting Captain and commanding officer of CIU in 2014, a position he held until 2016. In approximately 2014, HAHN, K. KEALOHA, and another individual formed Discount Energy Solutions, LLC, a residential solar company.

5.     Defendant MINH-HUNG NGUYEN (4) ("NGUYEN") joined HPD as an officer in 2006. From approximately 2012 to 2017, NGUYEN was assigned to

3

CIU at the rank of a footman.   From approximately 2010 to 2014, NGUYEN was married to K. KEALOHA's niece ("M.N.").

6.     Defendant GORDON SHIRAISHI (5) ("SHIRAISHI") joined HPD in 1983, graduating in the same Police Academy class as L. KEALOHA.   In approximately 2011, L. KEALOHA promoted SHIRAISHI to the rank of Captain and assigned him to be the commanding officer of CIU.   In 2014, L. KEALOHA again promoted SHIRAISHI to the rank of Major and assigned him to lead the Training Division of HPD. SHIRAISHI was later reassigned to District 7, and held the rank of Major until his retirement in 2017.

7.     Defendant DANIEL SELLERS (6) ("SELLERS") joined HPD in 1997, worked as a corporal in CIU from 2009 to 2011, became a detective in CID, and eventually returned to CIU as a detective in 2011.   SELLERS and K. KEALOHA met in high school, dated for several years, and continued a social and professional relationship for over 20 years.

8.     Niall Silva ("Silva") (charged elsewhere) was a police officer employed with HPD.   From approximately 2012 to December 2013, Silva was assigned to CIU as a technician.

9.     The United States Postal Inspection Service ("USPIS") was a federal law enforcement agency and arm of the executive branch of the United States designated to support and protect the United States Postal Service and its employees, infrastructure, and customers; to enforce the laws that defend the nation's mail

system; and to ensure public trust in the mail.  As part of its lawful and legitimate functions, USPIS investigated crimes against the property and the operation of the Postal Service and, where sufficient evidence existed, referred such offenses for criminal prosecution.  When investigating such crimes, it was material to USPIS to receive accurate information from potential witnesses.

10.    The United States Attorney's Office for the District of Hawaii ("USAO-Hawaii") was an agency of the United States and arm of the executive branch that, among other matters, prosecuted violations of federal criminal law in the United States District Court for the District of Hawaii ("USDC-Hawaii").

11.    The Federal Bureau of Investigation ("FBI") was a federal law enforcement agency and arm of the executive branch of the United States designated to investigate alleged violations of federal criminal law dealing with deprivation of civil rights and obstruction of justice.

Financial Accounts of K. KEALOHA and L. KEALOHA

12.    Between 2004 and 2017, defendants K. KEALOHA and L. KEALOHA opened and controlled over thirty separate bank accounts at various financial institutions located in the State of Hawaii.  Among the banks and credit unions used by defendants L. KEALOHA and K. KEALOHA to hold and move money were Aloha Pacific Credit Union ("APCU"), American Savings Bank ("ASB"), Bank of Hawaii ("BOH"), First Hawaiian Bank ("FHB"), Hawaii Law Enforcement Credit Union ("HLECU"), Hawaii Central Federal Credit Union ("HCFCU"), Hawaii State

5

Federal Credit Union ("HSFCU"), and Hawaii USA Federal Credit Union ("HUSAFCU"), each of which qualified as a "financial institution" pursuant to Title 18, United States Code, Section 20.

### Misappropriation of Trust Funds

13.    In or about 2004, while employed as a private attorney, K. KEALOHA was appointed by the Hawaii state court as "Guardian of the Property" for two minor children: Ransen Taito (charged elsewhere), then age 12; and A.T., then age 10. The state court further ordered K. KEALOHA to create individual trust accounts for Ransen Taito and A.T., and to deposit over $167,000 to be held in trust for their benefit. Pursuant to a state court order, all disbursements and transactions associated with these trust accounts were to be approved by both K. KEALOHA and her co-counsel in the state court guardianship case ("Attorney 1").

14.    In or about May 2004, K. KEALOHA opened two separate trust accounts for Ransen Taito and A.T. ("the Trust Accounts"), each containing over $83,884 in trust proceeds, but (in contravention of the Hawaii state court order) identified only herself as the trustee and authorized signatory on the Trust Accounts.

15.    Between May 2004 and February 2012, without notice to or approval from Ransen Taito, A.T., or Attorney 1, K. KEALOHA used almost all the funds in the Trust Accounts to pay the personal expenses of L. KEALOHA and K. KEALOHA, including:

    a.    On or about January 4, 2008, K. KEALOHA pledged one of the Trust Accounts as collateral for a $50,000 personal loan to K.  KEALOHA from ASB ("ASB x3126");

    b.    On or about March 1, 2008, K. KEALOHA pledged one of the Trust Accounts as collateral for a $38,500 personal loan to K. KEALOHA from ASB ("ASB x3296");

    c.    On or about January 12, 2009, K. KEALOHA withdrew $4,500 in cash from a Trust Account;

    d.    On or about March 19-20, 2009, K. KEALOHA pledged one of the Trust Accounts as collateral for a $55,082 personal loan from ASB ("ASB x5383"), and used a cashier's check to transfer $20,000 from ASB x5383 to pay for L. KEALOHA and K. KEALOHA's personal expenses;

    e.    On or about March 31, 2009, K. KEALOHA withdrew $3,300 in cash from a Trust Account;

    f.    On or about May 18, 2009, K. KEALOHA transferred $5,200 from a Trust Account to pay for L. KEALOHA and K. KEALOHA's personal expenses, including their home mortgage payment;

    g.    On or about May 18, 2009, K. KEALOHA withdrew $900 in cash from a Trust Account;

    h.    On or about May 18, 2009, K. KEALOHA caused an online transfer of $1,000 from a Trust Account to pay for personal expenses;

i.      On or about June 22, 2009, K. KEALOHA transferred $6,500 from a Trust Account to pay for L. KEALOHA and K. KEALOHA's personal expenses, including their mortgage payment;

j.      On or about June 26, 2009, K. KEALOHA withdrew $2,000 in cash from a Trust Account;

k.      On or about June 26, 2009, K. KEALOHA transferred $4,000 from a Trust Account to pay for L. KEALOHA and K. KEALOHA's personal expenses;

l.      On or about August 5, 2009, K. KEALOHA withdrew $1,100 in cash from a Trust Account;

m.      On or about March 19, 2010, K. KEALOHA used all the remaining funds in a Trust Account – over $55,000 – to pay off the outstanding loan balance on ASB x5383;

n.      On or about May 17, 2010, K. KEALOHA transferred $1,000 from a Trust Account to pay for L. KEALOHA and K. KEALOHA's personal expenses;

o.      On or about July 12, 2010, K. KEALOHA transferred $2,440 from a Trust Account to pay for L. KEALOHA and K. KEALOHA's personal expenses, including the cost of refinancing their home;

p.     On or about January 21, 2011, K. KEALOHA transferred $203 from a Trust Account to pay for overdraft charges on L. KEALOHA and K. KEALOHA's personal bank account; and

q.     On or about January 4, 2012, K. KEALOHA used all the remaining funds in a Trust Account – over $49,000 – to pay off the outstanding loan balance on ASB x3126.

16.    On numerous occasions between 2010 and 2012, K. KEALOHA provided false and misleading information to Attorney 1 and the Hawaii state court about the Trust Accounts, and concealed the fact that K. KEALOHA and L. KEALOHA had misappropriated almost $150,000 from the Trust Accounts.  For example:

a.     On or about August 10, 2010, K. KEALOHA prepared a court pleading falsely representing that prior to his eighteenth birthday, Ransen Taito controlled his Trust Account and had received all the funds held in that account.  K. KEALOHA fraudulently caused Ransen Taito to sign this false document, caused the forged signature of an alleged witness to be added, and filed the document and certain fraudulent exhibits with the Hawaii state court.

b.     On August 2-3, 2011, K. KEALOHA sent emails to her alias, "Alison Lee Wong," which she then forwarded to Attorney 1's law firm, in order to make it appear that K. KEALOHA was actively working towards closing Ransen Taito's and A.T.'s guardianships.

c.      On August 7, 2011, K. KEALOHA sent an email to Attorney 1's law firm claiming that "Alison" had "put together the final accounting [for Ransen Taito]" and had called Ransen Taito regarding signing the necessary documents to finalize Ransen Taito's account.

d.      On or about August 12, 2011, K. KEALOHA fraudulently convinced Ransen Taito to sign another pleading falsely claiming that Ransen Taito had received all of the funds in his Trust Account, and filed this false document with the Hawaii state court.

e.      On or about September 26, 2011, K. KEALOHA sent an email to Attorney 1's law firm, claiming she "plan[ned] on meeting with Alison [Lee Wong]" in several days to "go over the documents that [Ransen Taito] dropped off."

f.      On or about October 26, 2011, using the alias "Alison Lee Wong," K. KEALOHA sent a fraudulent email to Attorney 1's law firm regarding closing out Ransen Taito and A.T.'s guardianships, and falsely represented that Alison Lee Wong was "making sure all necessary documents are signed."

g.      On or about May 10, 2012, K. KEALOHA fraudulently induced Ransen Taito to sign a "Statement of Ransen Taito" that she created, which falsely stated that Ransen Taito had received over $83,884.91 from his Trust Account by the time he turned eighteen.

10

h.     On or about June 28, 2012, K. KEALOHA sent the false "Statement of Ransen Taito" to Attorney 1 in response to Attorney 1's persistent inquiries into K. KEALOHA's resolution of the guardianship case when Ransen Taito turned eighteen.

<u>Misappropriation of Funds from G.K.P.</u>

17.     In or about January 2007, K. KEALOHA told a relative ("G.K.P.") that she had access to an investment club (or "hui") that would generate significant monthly returns on any funds G.K.P. was able to invest.   Based on these representations, G.K.P. decided to invest some of the savings he had gathered from various sources, including his "disability" income.

18.     On or about February 22, 2007, G.K.P. gave K. KEALOHA $25,000 in cash from his safety deposit box as an initial investment with her.   Rather than investing this money, K. KEALOHA deposited the cash into a bank account she controlled, and used the funds to pay for personal expenses of L. KEALOHA and K. KEALOHA.

19.     To give the false appearance of investment returns, K. KEALOHA periodically withdrew $600 in cash from the bank account holding G.K.P.'s money and paid the money to G.K.P. as a "return" on his investment. Later, K. KEALOHA gave G.K.P. a debit card linked to the bank account that could be used to withdraw between $100 and $800 per month as "returns" on G.K.P.'s investment.

11

20.    Because of the false appearance that K. KEALOHA was safeguarding G.K.P.'s money and generating significant investment returns, G.K.P. gave more of his cash savings to K. KEALOHA, including on November 13, 2008 ($15,000) and October 16, 2009 ($30,000). G.K.P. ultimately handed over approximately $70,000 of his savings to K. KEALOHA for safekeeping and investment, of which G.K.P. received approximately $23,739 back as purported "investment returns." Instead of investing the approximately $70,000, L. KEALOHA and K. KEALOHA used over $45,000 of G.K.P.'s money to pay their personal expenses.

### Misappropriating Loan Proceeds from F.P.

21.    In or about 2009, K. KEALOHA's grandmother ("F.P.") asked K. KEALOHA about ways to purchase a condominium for her son, G.K.P. F.P. wanted to help G.K.P. with such a purchase because he had cared for F.P. for many years, and G.K.P. did not have sufficient credit to purchase such a property. In response, K. KEALOHA recommended a five-step process: first, F.P. would secure a "reverse mortgage" loan on her personal residence; second, F.P. would use a portion of the loan proceeds to purchase the condominium and pay expenses for the transaction; third, F.P. would use a portion of the proceeds to help L. KEALOHA and K. KEALOHA "consolidate" their bills, thereby allowing them to improve their credit; fourth, L. KEALOHA and K. KEALOHA would use their newly-improved credit to purchase the condominium from F.P.; and fifth, L. KEALOHA and K. KEALOHA would sell the condominium to G.K.P. by "taking back" a mortgage

12

so G.K.P. would make mortgage payments to them instead of to a bank. Based on K. KEALOHA's representations, F.P. agreed to the plan and allowed K. KEALOHA to negotiate with a lender so that F.P. could withdraw equity in her house through a reverse mortgage.

22.    In or about January 2009, K. KEALOHA requested that F.P. execute a Durable Power of Attorney appointing K. KEALOHA as her attorney-in-fact for the purpose of obtaining a reverse mortgage on F.P.'s property.

23.    In or about October 2009, K. KEALOHA caused a reverse mortgage to be executed on F.P.'s property, and caused F.P. to borrow approximately $513,474 in net loan proceeds from MetLife Home Loans to be deposited into a BOH bank account held jointly by K. KEALOHA and F.P. ("BOH x1502"). A portion of these funds was used to purchase the condominium for G.K.P., and the remainder (approximately $128,236) was to be used to "consolidate" L. KEALOHA and K. KEALOHA's debts and pay the expenses of F.P.

24.    Between October 2009 and April 2010, K. KEALOHA did not use the BOH x1502 account to pay many of the expenses of F.P.; she instead withdrew and transferred funds from BOH x1502 to pay the personal expenses of L. KEALOHA and K. KEALOHA, including:

| Expenses | Amount |
|---|---|
| Sheraton Waikiki – Police Chief Induction Brunch for L. KEALOHA | (26,394.80) |
| Car payments for Mercedes Benz & Maserati | (10,663.58) |
| HVAC installation at home of K. KEALOHA and L. KEALOHA | (7,800.00) |
| Payment to realtor | (7,000.00) |

| Expenses | Amount |
|---|---|
| Insurance Payments | (5,846.00) |
| Travel Expenses | (3,596.12) |
| Donations to Charity | (3,000.00) |
| Elton John Concert Tickets | (2,161.70) |
| Hawaiian Telcom | (2,070.51) |
| ATM Withdrawals | (1,582.25) |
| Cashier's check payable to friend of K. KEALOHA | (1,387.12) |
| Invitation and Paper Design Store | (1,292.83) |
| Hawaiian Airlines | (1,157.48) |
| Halekulani Hotel | (1,137.65) |
| T-Mobile | (980.01) |
| Disneyland, Anaheim | (965.02) |
| Bank Fees | (917.80) |
| Shell Oil | (900.00) |
| Honolulu Police Relief (charity) | (875.25) |
| Kincaids (restaurant) | (721.63) |
| Macy's | (713.54) |
| Revolution Motor Sport | (690.05) |
| Apple Store | (642.15) |
| Kahala Hotel-Plumeria Restaurant | (454.12) |
| Calista by Cotton Cargo (woman's clothing) | (452.84) |
| The UPS Store | (693.54) |
| United Airlines | (386.00) |
| Dave & Busters | (347.51) |
| Sushi Sasabune (restaurant) | (341.75) |
| Hilo Hawaiian Hotel | (331.65) |
| Ross Store | (328.45) |
| Verizon Wireless | (320.76) |
| Got Gifts-Hilo | (305.94) |
| Arbonne International | (296.14) |
| Longs Drugs | (281.31) |
| Rainforest, Anaheim (restaurant) | (279.68) |
| Brighton Collectibles (jewelry) | (276.93) |
| Vendor Payments less than $250 | (4,762.98) |
| TOTAL | (92,335.09) |

25.    By April 2011, K. KEALOHA had directed BOH to only mail monthly statements for BOH x1502 to a Post Office Box she controlled, and had refused G.K.P.'s requests for a return of his investment funds.   Additionally, because

14

K. KEALOHA was not making interest payments on F.P.'s reverse mortgage, the outstanding balance of this loan had grown substantially.

## Count 1

### Conspiracy (18 U.S.C. § 371)

26.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 25 of this Indictment.

27.    Beginning on a date unknown, but no later than 2011, and continuing through 2017, within the District of Hawaii and elsewhere, defendants KATHERINE P. KEALOHA (1), aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), aka Bobby Nguyen, GORDON SHIRAISHI (5), and co-conspirator Niall Silva (charged elsewhere) did knowingly and willfully combine, conspire, and agree together, with each other and with others to commit the following offenses against the United States:

a.    To willfully deprive, while acting under color of law, residents of Honolulu, Hawaii, of the rights secured and protected by the Constitution and laws of the United States to be free from unreasonable searches and seizures, in violation of Title 18, United States Code, Section 242;

b.    To corruptly alter, destroy, and conceal a record, document and other object with the intent to impair the object's integrity and availability for use in an official proceeding, and to corruptly obstruct, influence, and impede

15

an official proceeding, in violation of Title 18, United States Code, Section 1512(c);

      c.     To knowingly and willfully make a materially false, fictitious, and fraudulent statement in a matter within the jurisdiction of the executive branch of the Government of the United States in violation of Title 18, United States Code, Section 1001; and

      d.     To knowingly alter and falsify records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation of a matter within the jurisdiction of a department and agency of the United States, in violation of Title 18, United States Code, Section 1519.

<u>Manner and Means of the Conspiracy</u>

28.    It was part of the conspiracy that L. KEALOHA and K. KEALOHA would improperly use their authority to prevent the discovery and disclosure of their precarious financial condition and prior malfeasance involving the Trust Accounts, G.K.P. and F.P.

29.    It was further part of the conspiracy that the conspirators would target members of the community who threatened the power and financial condition of L. KEALOHA and K. KEALOHA, including G.K.P. and F.P.

30.    It was further part of the conspiracy that the conspirators would seek to discredit and intimidate such persons, including G.K.P. and F.P., by falsely alleging that such persons had engaged in criminal activity or were incompetent.

31.     It was further part of the conspiracy that the conspirators would attempt to secure evidence against such persons, including G.K.P. and F.P., by misusing the resources of CIU, by executing unconstitutional searches and seizures, and by abusing their official positions and law enforcement authority.

32.     It was further part of the conspiracy that the conspirators would fabricate, alter, and conceal evidence in order to support false claims of criminal conduct by G.K.P., and would seek to use such evidence to bring state and federal charges against G.K.P.

33.     It was further part of the conspiracy that the conspirators would provide fabricated evidence against G.K.P. to the USPIS and the USAO-Hawaii, and encourage them to pursue federal criminal charges against G.K.P.

34.     It was further part of the conspiracy that the conspirators would present false testimony and evidence in a criminal trial of G.K.P. in the USDC-Hawaii.

35.     It was further part of the conspiracy that, after a mistrial had been declared and the charges against G.K.P. had been dismissed, the conspirators would endeavor to obstruct the subsequent investigation by the FBI and a Federal grand jury in the District of Hawaii.

36.     It was further part of the conspiracy that the conspirators would attempt to provide false and misleading information to the FBI and the Federal grand jury, and convince witnesses to do the same.

## Overt Acts

37.    In furtherance of the conspiracy, the conspirators committed the following overt acts, among others, within the District of Hawaii and elsewhere:

a.    In or about June 2011, L. KEALOHA and K. KEALOHA caused CIU officers to conduct physical surveillance of G.K.P., and to continue such surveillance from time to time through June 2013.

b.    On or about June 27, 2011, after G.K.P. had been arrested by HPD for unlawfully entering another person's house, K. KEALOHA, MINH-HUNG NGUYEN, DANIEL SELLERS, charged below, and other HPD officers entered, searched, and seized items from G.K.P.'s house without lawful authorization.

c.    On or about March 30, 2012, DEREK WAYNE HAHN and MINH-HUNG NGUYEN arranged to file a false police report and submit latent fingerprints from an alleged burglary at L. KEALOHA and K. KEALOHA's then personal residence.

d.    On or about March 30, 2012, DEREK WAYNE HAHN wrote an HPD Incident Report stating that MINH-HUNG NGUYEN was the resident of the KEALOHAs' then personal residence (without mentioning the property was owned by L. KEALOHA and K. KEALOHA) and falsely reported that the alleged perpetrator had "disabled the surveillance system."

e.      On or about April 5, 2012, DEREK WAYNE HAHN submitted to the HPD laboratory for examination a set of latent fingerprints he allegedly recovered from the garage at the KEALOHAs' then personal residence.

f.      On or about the week of June 21, 2013, a conspirator altered the mechanism securing the mailbox out front of L. KEALOHA and K. KEALOHA's then personal residence, so that the mailbox could be easily removed.

g.      On or about June 21, 2013, at about 11:30 p.m., a conspirator drove a car to the front of the KEALOHAs' then personal residence, walked from the car to the mailbox in the front yard, lifted the unsecured mailbox from its post, placed it in his car, and drove away.

h.      On or about June 22, 2013, prior to any official report to HPD of the alleged theft, MINH-HUNG NGUYEN secretly removed the hard drive from the video surveillance system at the KEALOHAs' then personal residence and transported it to HPD headquarters.

i.      On or about June 22, 2013, at about 1:28 p.m., MINH-HUNG NGUYEN spoke with K. KEALOHA on the telephone.

j.      Immediately thereafter, on or about June 22, 2013, at about 1:31 p.m., K. KEALOHA called 911 and falsely reported that the mailbox in front of the KEALOHAs' then personal residence had been stolen.

19

k.      On or about June 22, 2013, after 1:31 p.m., K. KEALOHA provided a handwritten statement on HPD form 252 stating, in part: "[w]e will be reviewing our security camera and will give that information to the police when it becomes available." K. KEALOA did not reveal that the surveillance video of the alleged mailbox theft had already been retrieved by MINH-HUNG NGUYEN.

l.      On or about June 22, 2013, in the afternoon, MINH-HUNG NGUYEN met co-conspirator Niall Silva at HPD headquarters to review the video recording of the alleged mailbox theft at the KEALOHAs' then personal residence ("the Video") that NGUYEN had removed.

m.      On or about June 22, 2013, MINH-HUNG NGUYEN falsely identified G.K.P. as the person depicted on the Video allegedly stealing the mailbox.

n.      On or about June 22, 2013, after 2:30 p.m., DEREK WAYNE HAHN instructed Silva to violate HPD protocols and not log the original hard drive Video into evidence, but instead to create compact discs with excerpts of the Video.

o.      On or about June 22, 2013, following the orders given by DEREK WAYNE HAHN, Silva created compact discs with excerpts of the Video, gave copies of the excerpts to DEREK WAYNE HAHN and DANIEL SELLERS, and placed the original hard drive in his desk.

p.     On or about June 22, 2013, a co-conspirator in CIU caused a still shot from the Video – depicting the car used by the person who allegedly stole the mailbox – to be printed.

q.     On or about June 22, 2013, DEREK WAYNE HAHN called GORDON SHIRAISHI at approximately 2:49 p.m. and 3:56 p.m.

r.     On or about June 22, 2013, L. KEALOHA called GORDON SHIRAISHI at approximately 5:18 p.m.

s.     On or about June 22, 2013, between 7:10 p.m. and 8:01 p.m., K. KEALOHA and DEREK WAYNE HAHN exchanged approximately 30 text messages.

t.     On or about June 22, 2013, beginning at approximately 8:10 p.m., Silva and another co-conspirator in CIU caused electronic databases to be searched for information about G.K.P., his residence address, and his neighbors.

u.     On or about June 22, 2013, between 7:23 p.m. and 9:56 p.m., DEREK WAYNE HAHN and GORDON SHIRAISHI exchanged at least seven phone calls with each other.

v.     On or about June 22, 2013, MINH-HUNG NGUYEN and Silva drove in a HPD vehicle to G.K.P.'s residence and began surveillance.

w.      On or about June 22, 2013, GORDON SHIRAISHI and DEREK WAYNE HAHN caused HPD officers to keep G.K.P., and the residence of K. KEALOHA and L. KEALOHA, under continuous surveillance.

x.      On or about June 22-23, 2013, DEREK WAYNE HAHN and DANIEL SELLERS printed out information from electronic databases concerning G.K.P.'s neighbor.

y.      On or about June 23, 2013, between 2:49 a.m. and 2:56 a.m., K. KEALOHA and DEREK WAYNE HAHN exchanged approximately 10 text messages.

z.      On or about June 24, 2013, L. KEALOHA falsely identified G.K.P. as the person depicted on the Video allegedly stealing the mailbox.

aa.     On or about June 24, 2013, K. KEALOHA falsely accused G.K.P. of committing elder abuse and fraud against F.P., in an attempt to convince an HPD lieutenant to investigate G.K.P. for those alleged crimes.

bb.     On or about June 24, 2013, a co-conspirator in CIU caused law enforcement databases to be searched for information about G.K.P.'s neighbors.

cc.     On or about June 27, 2013, L. KEALOHA, K. KEALOHA, MINH-HUNG NGUYEN, and DEREK WAYNE HAHN created a false police report identifying G.K.P. as the suspect of an alleged burglary at the KEALOHAs' then personal residence on June 23 or 24, 2013.

dd.   On or about Saturday, June 29, 2013, K. KEALOHA falsely identified G.K.P. as the person in the Video allegedly stealing the mailbox.

ee.   On or about June 29, 2013, L. KEALOHA and K. KEALOHA caused DANIEL SELLERS to direct HPD officers to arrest G.K.P. for stealing their mailbox.

ff.   On or about June 29, 2013, between 5:09 p.m. and 5:12 p.m., L. KEALOHA and DEREK WAYNE HAHN exchanged approximately three phone calls.

gg.   On or about July 1, 2013, when logging the Video excerpts into HPD evidence, Silva created a false Follow Up Report claiming that he had collected the original Video hard drive from the KEALOHAs' then personal residence on June 22, 2013, at 8:59 a.m.

hh.   On or about July 3, 2013, after G.K.P. was charged with "willfully t[earing] down a receptacle used for the receipt of mail on a mail route," K. KEALOHA falsely told a USPIS Inspector that G.K.P. stole her mailbox to obtain bank statements.

ii.   On or about July 5, 2013, MINH-HUNG NGUYEN falsely told a USPIS Inspector that he had met Silva at the KEALOHAs' then personal residence and witnessed Silva recovering the original Video hard drive on the morning of June 22, 2013.

jj.   In November 2013, while a civil lawsuit involving K. KEALOHA and G.K.P. remained ongoing, K. KEALOHA directed DPA personnel to file an opposition to G.K.P.'s routine motion to dismiss his state court deferred prosecution and to attempt to convince the state court to convert G.K.P.'s deferred prosecution into a felony conviction.

kk.   Beginning on or about May 21, 2014 – after G.K.P.'s defense attorney sought and obtained an order from the USDC-Hawaii permitting the issuance of a subpoena *duces tecum* to K. KEALOHA and L. KEALOHA for video surveillance footage from June 20, 2013 to the date of the alleged mailbox theft – a conspirator caused the original hard drive containing video evidence to be permanently altered by attaching a camera to the hard drive and filming an image of CIU's office ceiling for almost one week.

ll.   On or about June 18, 2014, Silva falsely told a USPIS Inspector that he personally recovered the hard drive from the KEALOHAs' personal residence.

mm.   On or about June 18, 2014, shortly after Silva had provided false information to a USPIS Inspector, Silva called MINH-HUNG NGUYEN to discuss the false evidence that the conspirators had previously agreed to provide to authorities.

nn.   On or about June 19, 2014, Silva again provided a USPIS Inspector with false information about the "investigation" into the alleged mailbox theft.

oo.   In or about December 2014, K. KEALOHA filed a petition in Hawaii state court to force F.P. into a conservatorship, alleging that due to F.P.'s age she was not competent to manage her finances and had been "manipulated" and "co-opted" by G.K.P.

pp.   On or about December 1, 2014, MINH-HUNG NGUYEN and Silva discussed the conspirators' plan to provide false testimony at the upcoming federal criminal trial of G.K.P. in USDC-Hawaii.

qq.   On or about December 4, 2014, Silva falsely testified in the trial of G.K.P. in USDC-Hawaii that on June 22, 2013, at 8:59 a.m., he personally went to the KEALOHAs' then personal residence, verified the security system was in good working order on the date and time of the alleged theft, confirmed that recordings were made, and retrieved the recordings from the residence.

rr.   On or about December 4, 2014, at the trial of G.K.P. in USDC-Hawaii, L. KEALOHA falsely identified G.K.P. as the person depicted on the Video allegedly stealing the mailbox.

ss.   On or about December 4, 2014, MINH-HUNG NGUYEN texted Silva about the false evidence provided in the federal criminal trial of G.K.P.

tt.     On or about December 4, 2014, DEREK WAYNE HAHN spoke with Silva, and communicated by text message with MINH-HUNG NGUYEN, about the false evidence provided in the criminal trial of G.K.P.

uu.     On or about April 30, 2015, GORDON SHIRAISHI falsely claimed that on June 22, 2013, at about 9:00 a.m., he received a telephone call from L. KEALOHA complaining that his mailbox was gone, and that GORDON SHIRAISHI then directed DEREK WAYNE HAHN to send a member of CIU to L. KEALOHA's home to examine the video surveillance footage.

vv.     On or about November 16, 2015, GORDON SHIRAISHI told the FBI the same false version of events that GORDON SHIRAISHI provided on April 30, 2015.

ww.     On or about November 19, 2015, at about 3:42 p.m., after being contacted by the FBI about the investigation into G.K.P.'s criminal trial in USDC-Hawaii, MINH-HUNG NGUYEN called Silva.

xx.     On or about November 24, 2015, MINH-HUNG NGUYEN provided false and misleading information to the FBI about the alleged mailbox theft from the KEALOHAs' then personal residence.

yy.     On or about January 6, 2016, GORDON SHIRAISHI told the FBI the same false version of events that GORDON SHIRAISHI provided on April 30, 2015 and November 16, 2015.

zz.    On or about January 7, 2016, GORDON SHIRAISHI testified falsely before the Federal grand jury that on June 22, 2013, at approximately 9:00 a.m., while in his yard, he received a call on his cell phone from L. KEALOHA about the KEALOHAs' missing mailbox, and then called DEREK WAYNE HAHN and directed him to send a CIU technician to the KEALOHAs' residence to recover any video footage of the alleged theft.

aaa.    On or about April 20, 2016, K. KEALOHA advised Ransen Taito and A.T. not to tell the truth to the Federal grand jury, saying that if they did not continue to falsely claim to have received all of their money from the Trust Accounts, then K. KEALOHA and the Taito's mother could be returned to jail.

bbb.    On or about April 21, 2016, K. KEALOHA coached A.T. on how to provide false and misleading testimony to the Federal grand jury.

ccc.    On or about April 21, 2016, K. KEALOHA caused Ransen Taito and A.T. to provide false and misleading testimony to the Federal grand jury.

ddd.    On or about April 21, 2016, K. KEALOHA met with Ransen Taito and A.T., questioned them about their testimony, and provided them with various pieces of paper and directed them to sign false and misleading documents that would support their false testimony.

eee.    On or about April 21, 2016, MINH-HUNG NGUYEN falsely testified before the Federal grand jury that he was standing next to Silva at the

27

KEALOHAs' then personal residence when the original hard drive containing the Video was retrieved, and falsely claimed that G.K.P. was the person depicted in the Video.

fff.    On or about May 3, 2016, K. KEALOHA sent an email attaching the false and misleading documents she had caused Ransen Taito and A.T. to sign, so that these documents would be provided to the FBI and the Federal grand jury.

ggg.   On or about May 19, 2016, MINH-HUNG NGUYEN falsely testified before the Federal grand jury that he did not recall his repeated communications with Silva about the false information they were providing to USPIS and in G.K.P.'s criminal trial in USDC-Hawaii.

All in violation of Title 18, United States Code, Section 371.

## Counts 2-8

### Obstruction of Official Proceeding (18 U.S.C. § 1512(c)(2))

38. The grand jury realleges and incorporates by reference Introductory Allegations 1 through 25 of this Indictment.

39. On December 2, 2014, a Federal criminal trial commenced in USDC-Hawaii in the case of *United States v. G.K.P.*, Case No. 13CR0735-LEK. The trial ended on December 4, 2014, after a mistrial was declared. The case against G.K.P. was dismissed with prejudice on December 16, 2014.

40. Between November 19, 2015 and October 2017, a Federal grand jury was conducting a proceeding to determine whether violations of federal law had been committed by persons involved in the investigation and prosecution of *United States v. G.K.P.*

41. On or about the dates set forth below, in the District of Hawaii, the defendants identified below did corruptly attempt to obstruct, influence, and impede the official proceedings identified below:

| Count | Date | Defendant | Act |
|---|---|---|---|
| 2 | December 4, 2014 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), and MINH-HUNG NGUYEN (4) | LOUIS M. KEALOHA (2) testified falsely in the criminal trial of G.K.P. in USDC-Hawaii that the person depicted in the Video was G.K.P. |

| Count | Date | Defendant | Act |
|---|---|---|---|
| 3 | January 7, 2016 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), and GORDON SHIRAISHI (5) | GORDON SHIRAISHI testified falsely before the grand jury that on the morning of June 22, 2013, around 9:00 a.m., he received a call on his cell phone from L. KEALOHA about the KEALOHAs' missing mailbox, and then he called HAHN and directed him to send a CIU technician to the KEALOHAs' then personal residence to recover the hard drive from the video surveillance system |
| 4 | February 25, 2016 | DANIEL SELLERS (6) | DANIEL SELLERS testified in a false and misleading manner before the grand jury by denying involvement in any searches of G.K.P.'s home in 2011 |
| 5 | April 21, 2016 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), and GORDON SHIRAISHI (5) | K. KEALOHA caused Ransen Taito and A.T. to testify falsely before the Federal grand jury concerning the Trust Accounts |
| 6 | April 21, 2016, | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), and GORDON SHIRAISHI (5) | MINH-HUNG NGUYEN testified falsely before the grand jury that he was standing next to Silva at the KEALOHAs' then personal residence when the original hard drive containing the Video was retrieved from the residence, and claimed that G.K.P. was the person depicted in the Video |

| Count | Date | Defendant | Act |
|-------|------|-----------|-----|
| 7 | May 3, 2016 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), and GORDON SHIRAISHI (5) | K. KEALOHA sent an email attaching false and misleading documents she had caused Ransen Taito and A.T. to sign, so that these documents would be provided to the Federal grand jury |
| 8 | May 19, 2016 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), and GORDON SHIRAISHI (5) | MINH-HUNG NGUYEN (4) testified in a false and misleading manner before the grand jury by stating that he did not recall communicating with Silva about the false information they were providing to USPIS and in G.K.P.'s criminal trial |

All in violation of Title 18, United States Code, Section 1512(c)(2).

## Counts 9-11

### False Statements to Federal Officer (18 U.S.C. § 1001)

42.     The grand jury realleges and incorporates by reference Introductory Allegations 1 through 25 of this Indictment.

43.     Between June 30, 2013, and December 2014, USPIS had a criminal investigation into the alleged theft of a mailbox from the KEALOHAs' then personal residence. Between December 2014, and the date of this Indictment, the FBI had a criminal investigation into possible violations of federal law by persons involved in the investigation and prosecution of G.K.P. It was material to both the USPIS investigation and the FBI investigation to determine what steps had been taken by HPD to investigate the alleged crime, what evidence had been collected, and whether the witnesses could credibly testify about relevant facts.

44.     On or about the dates set forth below, in the District of Hawaii, the defendants identified below did willfully and knowingly make the following false, fictitious and fraudulent statements in a matter within the jurisdiction of the executive branch of the United States:

| Count | Date | Defendant | False Statement and Federal Agency |
|---|---|---|---|
| 9 | July 5, 2013 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), and MINH-HUNG NGUYEN (4) | MINH-HUNG NGUYEN falsely told USPIS Inspector B. Shaughnessy that Niall Silva had recovered the original Video hard drive from the KEALOHAs' then personal residence on the morning on June 22, and that NGUYEN had met Silva at the KEALOHAs' residence on June 22 |
| 10 | November 16, 2015 | KATHERINE KEALOHA (1), LOUIS M. KEALOHA (2), DEREK WAYNE HAHN (3), MINH-HUNG NGUYEN (4), GORDON SHIRAISHI (5) | GORDON SHIRAISHI falsely stated to the FBI that on June 22, 2013, at around 9:00 a.m., he received a call on his cell phone from L. KEALOHA complaining that his mailbox was gone, and that GORDON SHIRAISHI contacted DEREK WAYNE HAHN soon thereafter and directed that a technician from CIU be sent to L. KEALOHA's home to examine the video surveillance footage |
| 11 | January 11, 2017 | DANIEL SELLERS (6) | After Silva had pled guilty, DANIEL SELLERS presented a false story to the FBI concerning his whereabouts and activities on June 22, 2013 |

All in violation of Title 18, United States Code, Section 1001.

33

## Count 12

### Bank Fraud (18 U.S.C. § 1344)

45.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, and 12 through 16, of this Indictment.

46.    Beginning no later than December 2007, and continuing through January 2012, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud ASB and to obtain money and funds owned by and under the custody and control of ASB by means of materially false and fraudulent pretenses, representations and promises.

47.    It was part of the scheme that K. KEALOHA would apply to ASB for a "Savings Secured Loan" in the amount of $50,000 by fraudulently pledging as collateral the Trust Account owned by Ransen Taito.

48.    It was further part of the scheme that K. KEALOHA would falsely represent to ASB that the loan proceeds would be used to pay for "home improvement/tuition."

49.    It was further part of the scheme that K. KEALOHA and L. KEALOHA would use ASB's loan proceeds to pay for expenses other than the home improvement and tuition needs of Ransen Taito.

50.     It was further part of the scheme that when the Savings Secured Loan came due, K. KEALOHA would cause Ransen Taito's Trust Account to be liquidated and $49,580.99 of Ransen Taito's money to be used to repay ASB for K. KEALOHA's loan.

Execution of the Scheme

51.     On or about January 4, 2008, within the District of Hawaii, L. KEALOHA and K. KEALOHA knowingly executed the scheme by falsely certifying to ASB that K. KEALOHA owned the funds in the Trust Account and was authorized to pledge the Trust Account as collateral for the loan.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

Count 13

Bank Fraud (18 U.S.C. § 1344)

52.     The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, and 12 through 16, of this Indictment.

53.     Beginning no later than March 2009, and continuing through March 2010, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud ASB and to obtain money and funds owned by and under the custody and control of ASB by means of materially false and fraudulent pretenses, representations and promises.

35

54.     It was part of the scheme that K. KEALOHA would apply to ASB for a "Savings Secured Loan" in the amount of $55,082.22 by fraudulently pledging as collateral the Trust Account owned by A.T.

55.     It was further part of the scheme that K. KEALOHA would falsely represent to ASB that the loan proceeds would be used for "kid[']s expenses."

56.     It was further part of the scheme that K. KEALOHA and L. KEALOHA would use ASB's loan proceeds to pay for expenses other than those incurred for the benefit of A.T., including the repayment of an earlier Savings Secured Loan that K. KEALOHA had procured using A.T.'s Trust Account.

57.     It was further part of the scheme that K. KEALOHA would transfer $12,000 from this Savings Secured Loan into another bank account, and would use those funds to pay for the personal expenses of K. KEALOHA and L. KEALOHA, including an $8,000 credit card payment, a $6,247.77 mortgage payment, private school tuition payment for their child, property taxes and other real estate expenses.

58.     It was further part of the scheme that when the Savings Secured Loan came due, K. KEALOHA would cause A.T.'s Trust Account to be liquidated and $55,194.20 of A.T.'s money to be used to repay ASB for K. KEALOHA's loan.

<u>Execution of the Scheme</u>

59.     On or about March 19, 2009, within the District of Hawaii, L. KEALOHA and K. KEALOHA knowingly executed the scheme by falsely

certifying to ASB that K. KEALOHA owned the funds in the Trust Account and was authorized to pledge the Trust Account as collateral for the loan.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

## Count 14

### Bank Fraud (18 U.S.C. § 1344)

60.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, and 12 through 16, of this Indictment.

61.    Beginning no later than March 2010, and continuing through July 2010, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud HUSAFCU and to obtain money and funds owned by and under the custody and control of HUSAFCU by means of materially false and fraudulent pretenses, representations and promises.

62.    It was part of the scheme that L. KEALOHA and K. KEALOHA would apply to HUSAFCU for a first loan in the amount of $1,100,000 to refinance their mortgage on their then personal residence, and falsely certify that the information provided in support of their application was true and correct.

63.    It was further part of the scheme that on or about March 31, 2010, L. KEALOHA and K. KEALOHA would sign and submit to HUSAFCU a loan application falsely claiming the two Trust Accounts as their own assets.

64.     It was further part of the scheme that L. KEALOHA and K. KEALOHA would submit a letter dated March 12, 2010, falsely denying certain derogatory items on their credit report.

65.     It was further part of the scheme that K. KEALOHA would submit a letter of explanation in June 2010, providing false material statements about the credit history of L. KEALOHA and K. KEALOHA

66.     It was further part of the scheme that in or about June 2010, K. KEALOHA altered monthly statements for one of the Trust Accounts to make it appear that she owned the accounts, and forwarded those altered documents to HUSAFCU to support the loan application.

67.     On or about July 6, 2010, using the alias Alison Lee Wong, K. KEALOHA sent a fabricated email to herself at a different email address, and forwarded that email to her mortgage broker, in order to make it appear that derogatory credit associated with K. KEALOHA was erroneous, and that KEALOHA's assistant, "Alison Lee Wong," was attempting to correct such errors.

Execution of the Scheme

68.     On or about July 9, 2010, within the District of Hawaii, L. KEALOHA and K. KEALOHA knowingly executed the scheme by falsely certifying in a Form 1003 loan application that they personally owned the assets in one of the Trust Accounts, when in fact K. KEALOHA was merely a trustee on the Trust Account and the true owner was Ransen Taito.

38

All in violation of Title 18, United States Code, Section 1344(1) and (2).

## Count 15

## Bank Fraud (18 U.S.C. § 1344)

69.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, 5, and 12 through 16, of this Indictment.

70.    Beginning no later than June 2012, and continuing through July 24, 2012, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud HCFCU and to obtain money and funds owned by and under the custody and control of HCFCU by means of materially false and fraudulent pretenses, representations and promises.

71.    It was part of the scheme that L. KEALOHA and K. KEALOHA would apply to HCFCU for a second mortgage on their then personal residence in the amount of $150,000, and falsely certify that the information provided in support of their application was true and correct.

72.    It was further part of the scheme that in or about June 2012, K. KEALOHA would submit a forged "Hawaii Residential Lease Agreement" to HCFCU to give the false impression that L. KEAHLOA and K. KEALOHA received rental income every month.

## Execution of the Scheme

73.    On or about July 24, 2012, within the District of Hawaii, K. KEALOHA and L. KEALOHA knowingly executed the scheme by falsely certifying in a Form 1003 loan application that they received over $2,700 per month in rental income from MINH-HUNG NGUYEN (4) and M.N., when in fact no such lease agreement existed and the defendants did not receive rent or lease payments.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

## Count 16

### Bank Fraud (18 U.S.C. § 1344)

74.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, 5, and 12 through 16, of this Indictment.

75.    In or about March 2013, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud HCFCU and to obtain money and funds owned by and under the custody and control of HCFCU by means of materially false and fraudulent pretenses, representations and promises.

76.    It was part of the scheme that L. KEALOHA and K. KEALOHA would apply to HCFCU for a home equity line of credit on their then personal residence in the amount of $180,000, and falsely certify that the information provided in support of their application was true and correct.

77.   It was further part of the scheme that L. KEALOHA and K. KEALOHA would sign a Form 1003 loan application in support of the loan application.

78.   It was further part of the scheme that in or about June 2012, K. KEALOHA would submit a forged "Hawaii Residential Lease Agreement" to HCFCU to give the false impression that K. KEAHLOA and L. KEALOHA received rental income every month from MINH-HUNG NGUYEN (4) and M.N., when in fact no such lease agreement existed and the defendants did not receive rent or lease payments.

79.   It was further part of the scheme that K. KEALOHA and L. KEALOHA would falsely claim to HCFCU that derogatory information on their credit reports did not belong to them, and would provide false explanations for why derogatory items appeared on their credit reports.

Execution of the Scheme

80.   In or about March 2013, within the District of Hawaii, K. KEALOHA and L. KEALOHA knowingly executed the scheme by submitting a forged HPD police report, purportedly signed by HPD officer C.P.M. on March 30, 2009, and claiming that the defendants were the victims of identity theft, in an attempt to explain derogatory information on their credit reports.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

## Count 17

### Bank Fraud (18 U.S.C. § 1344)

81.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, and 12 through 16, of this Indictment.

82.    Beginning in or about June 2013, and continuing until August 30, 2013, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud HCFCU and to obtain money and funds owned by and under the custody and control of HCFCU by means of materially false and fraudulent pretenses, representations and promises.

83.    It was part of the scheme that L. KEALOHA and K. KEALOHA would apply to HCFCU for a $980,000 mortgage loan to purchase a home, and falsely certify that the information provided in support of their application was true and correct.

84.    It was further part of the scheme that L. KEALOHA and K. KEALOHA would submit to HCFCU letters of explanation dated March 12, 2010, and July 12, 2012, falsely representing that certain derogatory credit did not belong to them.

### Execution of the Scheme

85.    In or about August 2013, within the District of Hawaii, K. KEALOHA and L. KEALOHA knowingly executed the scheme by submitting a forged HPD

police report, purportedly signed by HPD officer C.P.M. on March 30, 2009, and claiming that the defendants were the victims of identity theft, in an attempt to explain derogatory information on their credit reports.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

## Count 18

## Bank Fraud (18 U.S.C. § 1344)

86.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, and 12 through 16, of this Indictment.

87.    Beginning in or about May 2014, and continuing until July 11, 2014, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud HCFCU and to obtain money and funds owned by and under the custody and control of HCFCU by means of materially false and fraudulent pretenses, representations and promises.

88.    It was part of the scheme that L. KEALOHA and K. KEALOHA would apply to HCFCU for a $90,000 home equity loan for "debt consolidation", and falsely certify that the information provided in support of their application was true and correct.

89.    It was further part of the scheme that L. KEALOHA and K. KEALOHA would submit to HCFCU a letter of explanation dated July 12, 2012, falsely representing that certain derogatory credit accounts did not belong to them.

## Execution of the Scheme

90.    In or about July 2014, within the District of Hawaii, K. KEALOHA and L. KEALOHA knowingly executed the scheme by submitting a forged HPD police report, purportedly signed by HPD officer C.P.M. on March 30, 2009, and claiming that the defendants were the victims of identity theft, in an attempt to explain derogatory information on their credit reports.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

## Count 19

## Bank Fraud (18 U.S.C. § 1344)

91.    The grand jury realleges and incorporates by reference Introductory Allegations 1 through 3, and 12 through 16, of this Indictment.

92.    Beginning in or about June 2016, and continuing until September 12, 2016, within the District of Hawaii, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA knowingly devised, with the intent to defraud, a material scheme to defraud HCFCU and to obtain money and funds owned by and under the custody and control of HCFCU by means of materially false and fraudulent pretenses, representations and promises.

44

93.     It was part of the scheme that L. KEALOHA and K. KEALOHA would apply to HCFCU for a $1,040,000 refinancing of their mortgage and "cash out" of approximately $32,000, and a $172,500 home equity line on an investment property.

94.     It was further part of the scheme that K. KEALOHA would sign and provide a letter of explanation, dated August 5, 2016, falsely claiming that different handwriting appeared in the loan application because K. KEALOHA had "serious health issues which have affected [her] vision and handwriting."

95.     It was further part of the scheme that L. KEALOHA and K. KEALOHA would submit a forged HPD police report, purportedly signed by HPD officer C.P.M. on March 30, 2009, in an attempt to claim that the defendants were the victims of identity theft and explain away their poor credit history.

### Execution of Scheme

96.     In or about July 2016, within the District of Hawaii, K. KEALOHA and L. KEALOHA knowingly executed the scheme by submitting a letter of explanation that falsely denied certain derogatory items on their credit report, and falsely disavowed certain credit accounts that belonged to them.

All in violation of Title 18, United States Code, Section 1344(1) and (2).

Counts 20-23

Aggravated Identity Theft (18 U.S.C. § 1028A)

97.     The grand jury realleges and incorporates by reference Introductory

Allegations 1 through 3, and 12 through 16, of this Indictment.

98.     On or about the dates set forth below, within the District of Hawaii,

defendant KATHERINE P. KEALOHA (1), aka Katherine E. Kealoha, aka Kathy

Kealoha, aka Kat, aka Alison Lee Wong, did knowingly use without lawful authority

a means of identification of another person during and in relation to a felony

violation enumerated in 18 U.S.C. § 1028A(c) – that is, Bank Fraud in violation of

Title 18, United States Code, Section 1344 – knowing that the means of

identification belonged to another actual person:

| Count | Date | Means of Identification | Felony Violation Alleged In |
|-------|------|------------------------|------------------------------|
| 20 | March 2013 | C.P.M.'s name, that is, the forged signature of C.P.M. | Count 16 |
| 21 | August 2013 | C.P.M.'s name, that is, the forged signature of C.P.M. | Count 17 |
| 22 | July 2014 | C.P.M.'s name, that is, the forged signature of C.P.M. | Count 18 |
| 23 | July 2016 | C.P.M.'s name, that is, the forged signature of C.P.M. | Count 19 |

All in violation of Title 18, United States Code, Section 1028A.

46

## Forfeiture Allegations

99.    The allegations contained in paragraphs 1 through 25 of the Introductory Allegations, and Counts 1 through 23 of this Indictment, are realleged and incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a)(2)(A).

100.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 1344, set forth in Counts 12 through 19 of this Indictment, defendants KATHERINE P. KEALOHA, aka Katherine E. Kealoha, aka Kathy Kealoha, aka Kat, aka Alison Lee Wong, and LOUIS M. KEALOHA shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations.  The property to be forfeited includes, but is not limited to, the following:

a.    The total amount of proceeds obtained directly or indirectly as a result of the offenses;

b.    All of that certain parcel of land situated at Maunalua, Honolulu, City and County of Honolulu, State of Hawaii, being LOT 84 of the "LUNA-KAI MARINA, UNIT 9-A," as shown on File Plan No. 1116, filed in the Bureau of Conveyances of the State of Hawaii, and containing an area of 7,508 square feet, more or less; and

47

c.   A Rolex Two-Tone Submariner Watch with Blue Dial Large Karat Gold, Serial Number V864527.

101.   If any of the property described above, as a result of any act or omission of the defendants (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

Dated: March 22, 2018, at Honolulu, Hawaii.

A TRUE BILL

/s/ Foreperson
FOREPERSON, GRAND JURY

JEFFERSON B. SESSIONS III
United States Attorney General
ADAM L. BRAVERMAN
United States Attorney

MICHAEL G. WHEAT, CBN 118598
ERIC J. BESTE, CBN 226089
JANAKI S. GANDHI, CBN 272246
COLIN M. MCDONALD, CBN 286561
Special Attorneys to the Attorney General