WILLIAM P. BARR
Attorney General
ROBERT S. BREWER, JR.
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI S. GANDHI, CBN 272246
COLIN M. MCDONALD, CBN 286561
Special Attorneys to the Attorney General
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144
michael.wheat@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>       v.<br><br>KATHERINE P. KEALOHA (1),<br>LOUIS M. KEALOHA (2),<br>DEREK WAYNE HAHN (3),<br>MINH-HUNG NGUYEN (4),<br>GORDON SHIRAISHI (5),<br><br>                              Defendants. | CR. NO. 17-00582 JMS-RLP<br><br>UNITED STATES' TRIAL BRIEF<br><br>Trial Date: May 13, 2019<br>Time: 9:00 a.m.<br><br>Hon. J. Michael Seabright |

The United States, through its counsel, Robert S. Brewer, Jr., United States

Attorney, and Michael G. Wheat, Joseph J.M. Orabona, Janaki S. Gandhi, and Colin

M. McDonald, Special Attorneys to the Attorney General, hereby files its Trial Brief.

# I

## STATEMENT OF THE CASE

### A.    The Indictment

On March 22, 2018, the grand jury in the District of Hawaii returned the First Superseding Indictment against defendants Katherine P. KEALOHA, Louis M. KEALOHA, Derek Wayne HAHN, Minh Hung-NGUYEN, and Gordon SHIRAISHI (collectively "Defendants"), charging them with three separate crimes: (1) conspiracy to deprive civil rights, obstruct an official proceeding, make false statements, and alter and falsify records, in violation of 18 U.S.C. § 371 (Count 1); (2) obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c) (Counts 2, 3, 6, and 8); and (3) making false statements to a federal officer, in violation of 18 U.S.C. § 1001 (Counts 9 and 10).[1]

### B.    Trial Status

A jury trial is scheduled to begin on May 13, 2019, at 9:00 a.m. Following jury selection, opening statements are expected to begin on or about May 23, 2019. The United States estimates its case-in-chief will last approximately 15-18 trial days.

### C.    Defense Counsel

Cynthia A. Kagiwada has been appointed to represent Defendant K. KEALOHA; Rustam Barbee has been appointed to represent Defendant L.

---

[1]    The first superseding indictment included bank fraud and aggravated identity theft charges. Those charges are now proceeding in CR 18-00068-JMS-RLP.

KEALOHA; Birney B. Bervar is retained to represent Defendant HAHN; Randall K. Hironaka has been appointed to represent Defendant NGUYEN; and Lars R. Isaacson is retained to represent Defendant SHIRAISHI.

D.    Custody Status

All defendants are currently on pretrial release pending trial.

E.    Jury Waiver

Defendants have not filed a jury waiver.

F.    Presentation of Evidence

The United States will utilize PowerPoint for its opening statement and closing arguments, and Trial Director, a computer-based evidence presentation system, to publish its trial evidence.  If during deliberations the jury wishes to listen to audio evidence or watch video evidence, and the Court permits this review to be done in the jury room outside the presence of the parties, the United States will provide a stand-alone monitor with speakers for the jury to use.

G.    Pre-Trial Rulings

On December 20, 2017, the Court denied Defendants K. KEALOHA and L. KEALOHA's motion for a bill of particulars.  ECF No. 135.  On April 26, 2019, the Court denied Defendants K. KEALOHA and L. KEALOHA's renewed motion for a bill of particulars.  ECF Nos. 559, 560. On June 14, 2018, the Court denied Defendant SHIRAISHI's motion for a bill of particulars. ECF No. 256. On appeal, the Court affirmed the Magistrate Judge's decision. ECF No. 262.  On May 3, 2018,

the Court granted in part and denied in part various defense motions related to severance of counts. ECF Nos. 230, 232.

In February 2019, the Court denied the following motions:

a. Defendants K. KEALOHA and L. KEALOHA's motion to suppress statements and evidence under *Garrity v. New Jersey*.[2] ECF No. 398.
b. Defendant K. KEALOHA and L. KEALOHA's motion to dismiss. ECF No. 423.
c. Defendant SHIRAISHI's motion to dismiss. ECF No. 425.
d. Defendant NGUYEN's motion to suppress evidence under *Carpenter v. United States*. ECF No. 397.

In March 2019, the Court issued written rulings on various motions *in limine* filed by the parties, including: (1) granting the United States' motion to exclude Defendant SHIRAISHI's proffered "memory" expert (ECF No. 520); and (2) denying Defendant HAHN's motion to exclude the United States' expert testimony regarding historical cell-site data (ECF No. 510).

Beyond the two written orders above, the Court orally ruled on the parties' motions *in limine*, as reflected in ECF No. 501. *See also* ECF No. 513 (hearing transcript). Among these oral rulings, the Court denied K. KEALOHA and L. KEALOHA's motion *in limine* to limit evidence of their fraud against Gerard Puana and Florence Puana to facts occurring after 2011. The Court stated,

[T]he evidence that I will permit includes the alleged fraud from 2007 to 2009 based on the claim that Ms. Kealoha obtained approximately $70,000 from Gerard to invest for him but only returned $23,000 and essentially spent the rest.

---

[2]   Defendant SHIRIASHI filed a similar *Garrity* motion. However, following the United States' response, SHIRAISHI withdrew his motion. ECF No. 377.

It would also include the alleged fraud -- and I don't know if I have these time frames exactly right, but I have 2009 to 2011 is how I have this figured out, relating to the reverse mortgage, including how Ms. Kealoha failed to make reverse mortgage payments, how the funds were used to pay Kealoha personal expenses, how the condo was placed in trust with Ms. Kealoha as trustee, with the document notarized by Alison Lee Wong.

ECF No. 513 at 42-43 (Transcript of Motion *in Limine* Hearing).

The Court also denied K. KEALOHA and L. KEALOHA's motion to exclude evidence pertaining to "Alison Lee Wong," the alleged notary of Gerard Puana's trust. The Court ruled that the United States could present evidence that "Alison Lee Wong was an alias used by Katherine Kealoha in instances other than the trust document, but you have to do so without proving up the Taito and the bank fraud." *Id.* at 46. The Court instructed the United States to first preview that evidence with the Court to "make sure it's within . . . the ruling that I'm setting forth." *Id.*

The Court denied the United States' motion to admit evidence of further fraud perpetrated by K. KEALOHA and L. KEALOHA, including misuse of guardianship funds and bank fraud.  However, the Court made clear that "the defense could easily open a door to the introduction of this evidence."  *Id.* at 45.  The Court also ordered that certain facts not be mentioned during opening statements, including any alleged drug use of Gerard Puana, *id.* at 54 ("I think I need to see the context in which this comes in. So I'm going to order it not be mentioned during opening and nobody to mention it until -- until it's discussed with me"), and "anything about the verdict" in the prior civil lawsuit involving K. KEALOHA and the Puanas, *id.* at 16.

On April 16, 2019, the Court denied Defendant SHIRAISHI's motion *in limine* to preclude the United States from using a report drafted by co-conspirator Niall Silva at trial.  ECF No. 548.

H.    Stipulations

The parties are close to reaching stipulations. The United States has proposed stipulations as to the foundation of certain exhibits, such as audio recordings and certified transcripts.   Three of five defendants have agreed to the proposed stipulations to date.  The United States is awaiting a response from the remaining defendants.  If the proposed stipulations are adopted by all parties, several records custodians and court reporters will not need to travel to Hawaii for testimony.

I.    Discovery

The United States has produced substantially more evidence than was required under the discovery rules, and will continue to comply with its statutory and constitutional discovery obligations. The United States has received some reciprocal discovery from Defendant HAHN.  No other defendant has provided reciprocal discovery.

## II

## STATEMENT OF FACTS

A.    The Mailbox Frame Job

> *I WILL seek the highest form of legal retribution against ANYONE and EVERYONE who has written or verbally uttered those LIES*

> *about me! They will rue the day that they decided to state these*
> *TWISTED LIES!*

That was K. KEALOHA's written response to her elderly grandmother's pleas for honesty in September 2012, after K. KEALOHA stole hundreds of thousands of dollars from her grandmother, Florence Puana, and uncle, Gerard Puana.  Leading up to K. KEALOHA's response, Florence and Gerard had repeatedly tried to get K.KEALOHA to tell them where the money she took from a reverse mortgage on Florence's house and Gerard's life savings had gone.  Failing to get a response concerning the whereabouts of their money, Florence and Gerard were forced to file a civil suit against K. KEALOHA.

K. KEALOHA—an attorney and high-ranking city prosecutor—kept her promise of legal retribution.  Approximately nine months after penning the above letter, on Saturday, June 22, 2013, at around 1:30 p.m., K. KEALOHA called 911 to report the "theft" of her mailbox.[3] Over the course of the next week, defendants K. KEALOHA, L. KEALOHA, and NGUYEN—the Kealohas' nephew by marriage and a junior member of the Honolulu Police Department's ("HPD") Criminal Intelligence Unit ("CIU")—falsely identified K. KEALOHA's uncle, Gerard, as the "thief" depicted in the home surveillance video. That same week, K. KEALOHA

---

[3]      The evidence at trial will establish the mailbox was not stolen at all. The box was prepared in advance to be easily removed from its base and rod, without any tools. The Kealohas' home surveillance video should have recorded that preparation, but that video evidence was conspicuously destroyed.

also tried to convince HPD to pursue elder abuse, fraud, and burglary investigations against Gerard; separately, K. KEALOHA also filed a police report – written by NGUYEN– claiming that Gerard was the culprit in a burglary at the Kealoha residence that week.  Only the mailbox allegation stuck.[4]

Ultimately, the criminal case against Gerard proceeded to trial in federal court. The trial commenced on December 2, 2014. The prosecution's first witness was co-conspirator Niall Silva, a CIU technician. Silva testified that, following instructions from CIU superiors (HAHN and SHIRAISHI), he arrived at the Kealoha residence around 9:00 a.m. on June 22, 2013, to recover the hard drive containing the surveillance video.  Silva testified NGUYEN was at the residence when he arrived.

L. KEALOHA was the next trial witness. He claimed to have noticed that the mailbox was missing when he left early that morning to go surfing, but chose not to report it at that time.  Instead, L. KEALOHA claimed he waited until returning from surfing around 9:30 a.m. to tell his wife, K. KEALOHA, about the "missing" mailbox.  L. KEALOHA stated that K. KEALOHA then reported the "missing" mailbox to the police.  L. KEALOHA further testified that he recognized the person in the surveillance video as Gerard. When asked how he recognized Gerard — after first answering that Gerard's shorts were distinctive (because "they had, like,

---

[4]     When an HPD officer told K. KEALOHA he would look into the elder abuse/fraud allegations by requesting source documents from the bank, K. KEALOHA immediately withdrew her request for the investigation. (Those bank records show K. KEALOHA stole nearly $150,000 from Florence.)

pockets on the side")—L. KEALOHA stated "how [Gerard] looks in this video is how he looked when he was charged and convicted for breaking into his neighbor's house."  That improper statement derailed the trial (and precluded Gerard's defense counsel from establishing that his client was framed for the alleged crime).  The case was declared a mistrial and eventually dismissed.

The trial record left one glaring question unanswered: how did members of CIU know to go to the Kealoha residence by 9:00 a.m. to retrieve the surveillance video if the "theft" had not even been reported at that time? (As stated above, K. KEALOHA's call to the police did not happen until around 1:30 p.m.)

Five months after Gerard's mistrial, SHIRAISHI—the commanding officer of CIU[5]—stepped forward to supply the additional fact necessary to (seemingly) account for Silva's presence at the Kealoha residence at 9:00 a.m. on June 22, 2013. While speaking with the Honolulu Ethics Commission on April 30, 2015, SHIRAISHI claimed for the first time that L. KEALOHA had called him on the morning of the alleged theft to report his mailbox missing. SHIRAISHI – who claimed that he was at home on that Saturday morning when the Chief called –told the Commission that in response to the Chief's call, he directed HAHN to have a

---

[5]     SHIRAISHI joined HPD in 1983, and graduated in the same police class as L. KEALOHA.  During L. KEALOHA's tenure as Chief of Police, L. KEALOHA first promoted SHIRAISHI to the rank of Captain and assigned him to lead CIU, and then to made him a Major leading the training division.  At trial, the United States will elicit this and other evidence of close relationships between the co-conspirators.

CIU technician (Niall Silva) report to the Kealoha residence and examine the surveillance video. SHIRIASHI repeated basically the same (though progressively more detailed) story to the FBI during interviews on November 16, 2015, and January 6, 2016, and then again before the federal grand jury on January 7, 2016.

Yet the evidence at trial will prove that SHIRAISHI's cover story was false. He did not receive a call from L. KEALOHA on the morning of June 22, 2013; he was not at his house on that morning; he did not place a call to HAHN that morning; and he did not cause Silva to respond to the Kealoha residence. Indeed, Silva has since admitted that he was not at the Kealoha residence that morning, but that he first saw the video when NGUYEN brought it to HPD in the afternoon.

B.     The Back Story – Investment Hui and Reverse Mortgage

As part of its effort to prove a motive to frame and discredit Gerard and Florence, the United States will offer evidence that K. KEALOHA defrauded her relatives.  Specifically, she defrauded Gerard by taking his money under the guise of a sham investment hui.  In January 2007, K. KEALOHA told Gerard that she was involved in an investment "hui," that she could invest his money in the hui, and he could earn a significant return.  Agreeing to this scheme, Gerard ended up giving K. KEALOHA a total of about $70,000 in various amounts.  Shortly after receiving Gerard's first batch of money, K. KEALOHA deposited Gerard's money into a bank account.  Ultimately, K. KEALOHA permitted Gerard to withdraw less than a third of his money from the account; the Kealohas spent the rest.

Shortly thereafter, around January 2009, Florence wanted to help Gerard purchase a condominium, but she did not have sufficient funds. K. KEALOHA suggested Florence obtain a reverse mortgage on Florence's home to purchase the Greenwood Condo. With additional funds from the reverse mortgage, K. KEALOHA would consolidate the KEALOHAs' loans and refinance their home; then, K. KEALOHA would pay off the reverse mortgage and obtain a separate mortgage for the Greenwood Condo; thereafter, Gerard would make monthly payments for the Greenwood Condo directly to K. KEALOHA. Florence agreed to the reverse mortgage only after K. KEALOHA assured Florence she would pay off the reverse mortgage in 3 to 6 months. Florence agreed to, over a $530,000 reverse mortgage.  The condo was thereafter purchased for approximately $360,000.  K. KEALOHA never paid off the reverse mortgage, and spent the balance of the reverse mortgage funds (nearing $150,000) on her and L. KEALOHA's lavish lifestyle.

K. KEALOHA made various false statements about the transactions associated with the purchase of the Greenwood Condo. For example, in a "Tax Clarification Affidavit" that K. KEALOHA convinced Florence to sign on July 30, 2010, K. KEALOHA claimed she "initiated this transaction with $83,600 of her own funds, which were the result of a residential home sale in 2005." The financial records related to the Greenwood Condo show this statement to be false.  The records show that Kealohas only contributed approximately $17,910.60 towards this

11

purchase.  Moreover, these records show that at least $7,200 of these contributions came from loan proceeds obtained by pledging funds owned by a third party (A.T.).[6]

In another example, Florence sent a letter to K. KEALOHA on September 10, 2012, explaining how she had "trusted" K. KEALOHA with the reverse mortgage. In her response (which also contained the threat above), K. KEALOHA exclaimed:

> I HAVE NEVER, WILL NEVER OR WOULD NEVER BORROW, TAKE OR EVEN REQUEST to BORROW ANY MONEY FROM FLORENCE PUANA!

K. KEALOHA continued, "I WILL ALSO PROVE that I EXPENDED MY OWN PERSONAL FUNDS to INITATE the Condominium purchase, to keep this purchase ACTIVE when the reverse mortgage was stalled and even POST-transaction I was still expending my own funds on behalf of Florence and Gerard Puana!"  However, K. KEALOHA's claims of financial generosity were false. Specifically, bank records show that from 2009 to 2012, K. KEALOHA and L. KEALOHA spent more money than they earned, and were only able to meet their expenditures by taking funds from Florence, Gerard, and others.

## C.  Trying to Banish Gerard in 2011

The staged mailbox theft was not the Kealohas' first, or only, attempt to discredit Florence and Gerard.  In 2011, Gerard began asking K. KEALOHA for his

---

[6]     Unless the defense opens the door, the United States does not intend to prove the deception used by K. KEALOHA in misappropriating the funds from A.T.  At a minimum, however, the United States is entitled to prove the falsity of Defendant K. KEALOHA's statements about her financial contribution to the Greenwood Condo.

money.  K. KEALOHA told him his money was unavailable as it was "tied up in an investment."  Gerard was upset by this.  During this time, K. KEALOHA began reporting to family members that someone was vandalizing their home and windows had been "shot out." Gerard eventually became the one K. KEALOHA blamed.

Then, in June 2011, K. KEALOHA made her first attempt to use the criminal justice system to banish Gerard.  Gerard got into a parking dispute with neighbors at Florence's home (where Gerard used to reside).  Gerard became angry about the parking situation on the street and, without knocking, entered the neighbor's enclosed lanai, where he verbally confronted the neighbor's wife about the car situation.  After a few minutes, the police arrived, talked to the neighbor, and arrested Gerard for unlawful entry into a dwelling. None of the arresting officers entered Gerard's residence as no crime occurred there. In addition, no search warrants were sought or obtained for the residence.  And, HPD records show no seizure of any drugs or contraband found inside the house.  Despite the absence of any records, K. KEALOHA led a search of Gerard's home that the day.  K. KEALOHA called her cousin, who lived four doors down the street, and told her that "Uncle Gerry" was about to be arrested. The cousin left for about two hours at K. KEALOHA's direction and then returned.  Upon her return, the cousin saw several police officers, uniformed and in plainclothes, inside the residence.  Ultimately, K. KEALOHA told the cousin they were at the house because "Uncle Gerry was selling drugs" as part of a drug ring, and she just "confiscated over 100 tablets of pure Ecstasy."  The

cousin asked to see the ecstasy, but K. KEALOHA said it was on its way to the police department.

After his arrest, Gerard called his son and told him to get money for bail from his house. Gerard had $15,000 in cash in a filing cabinet in his room. When his son went to get the money, it was gone. K. KEALOHA told the cousin not to let anyone in the family bail Gerard out of jail. K. KEALOHA said Gerard "needed to get help," and if he were bailed out he would not get the help he needed. K. KEALOHA told the family she was checking up on Gerard, visiting him in prison, and making sure he had money on his card to buy snacks. K. KEALOHA also told the cousin that Gerard was a "meth" addict, and he tested positive for methamphetamine when he was arrested. This shocked the cousin, as she had never seen any indication of meth use during any of her numerous interactions with Gerard. K. KEALOHA eventually leveraged her authority as a prosecutor to admit Gerard into a residential drug treatment program at Sand Island, where Gerard stayed for a week before being transferred out after refusing to admit he had a methamphetamine problem. Gerard was released from custody in 2012, after 71 days, and his case was later dismissed.

When Gerard returned home, he discovered that in addition to the missing $15,000, all the HPD shirts L.KEALOHA had given him, a cap gun, his father's will, and other documents, were all missing from his home. In October 2012, Gerard received a box in the mail. The return address label displayed K. KEALOHA's name and the address of a UPS Store where K. KEALOHA held at least one P.O. Box.

14

Inside the box were the items that were missing from Gerard's house: a list of documents related to the Greenwood Condo, Gerard's father's will and trust, two switchblade knives, a camera memory card, and a toy cap gun. The box did not contain the missing $15,000, or his HPD shirts.  Handwriting analysis has confirmed that K. KEALOHA was the author of the label on the box.

D.    <u>Summary</u>

The United States' trial evidence will outline (1) the Kealohas' motive for framing Gerard Puana and seeking to discredit Florence Puana, (2) the conspirators' preparation for the staged mailbox "theft," (3) the immediate aftermath of the staged "theft," and (4) the efforts by the co-conspirators to cover-up their crimes.

III

<u>WITNESSES</u>

The United States will submit its witness list in a separate pleading.

IV

<u>EXHIBITS</u>

As directed by the Court, an exhibit list will be filed with the Court on May 10, 2019.  Also, exhibits will be pre-marked and provided to the Court and defense by May 17, 2019, along with a detailed exhibit list.  In summary, the United States intends to offer evidence related to the following categories of exhibits:

1.    <u>Honolulu Police Department Records</u> – time cards, personnel records, telephone information, and HPD reports.

2.    <u>Telephone Records</u> – charts and summaries of telephone and geolocation records pertaining to defendants.

3.    <u>Video/Stills</u> – videotape footage and still images, including surveillance video from the Kealoha residence.

4.    <u>Audio</u> – audio recordings of statements made by defendants or co-conspirators.

5.    <u>Transcripts</u> – certified transcripts containing prior sworn testimony of defendants or co-conspirators.

6.    <u>Email Records</u> – email records pertaining to defendants and any aliases.

7.    <u>Photographs</u> – photographs of defendants and cooperators, vehicles, relevant locations, and aerial maps.

8.    <u>Financial Records</u> – bank statements, checks, trusts, and summary charts.

V

<u>LEGAL ISSUES</u>

A.    <u>Essential Elements and Relevant Case Law</u>

**1.    Conspiracy – 18 U.S.C. § 371**

The essential elements of conspiracy are as follows:

First, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

Ninth Circuit Model Criminal Jury Instruction § 8.20 (2010).

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed. *Id.* "An agreement to commit a crime can be explicit or tacit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016); *see also United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) ("The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture.").

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. The jury must find there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with the jury agreeing as to the particular crime which the conspirators agreed to commit. Ninth Circuit Model Criminal Jury Instruction § 8.20.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as

responsible for it as the originators. On the other hand, one who has no knowledge of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists. *Id.*

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The government is not required to prove that a defendant personally did one of the overt acts. *Id.* Moreover, "so long as jurors in a federal criminal trial unanimously agree that the Government has proven each element of a conspiracy, they need not unanimously agree on the particular overt act that was committed in furtherance of the agreed-upon conspiracy." *United States v. Gonzalez*, 786 F.3d 714, 718–19 (9th Cir. 2015) (citation and quotation omitted).

"The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment. This is consistent with our own prior precedent and that of other circuits." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011).

a.   *Pinkerton* Liability

In addition to being charged in Count 1 with Conspiracy, each of the defendants is charged with substantive offenses committed by a co-conspirator. "Under *Pinkerton v. United States*, [328 U.S. 640 (1946)], a defendant charged with participating in a conspiracy may be subject to liability for offenses committed as

18

part of that conspiracy, even if the defendant did not directly participate in each offense." *United States v. Grasso*, 724 F.3d 1077, 1089 (9th Cir. 2013); *United States v. Hernandez-Orellana*, 539 F.3d 994, 1007 (9th Cir. 2008) (*Pinkerton* "renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not"). As the model jury instruction puts it, "[e]ach member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy." Ninth Circuit Model Criminal Jury Instructions § 8.25 (2010). "If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime." *Id.*

*Pinkerton* liability does not require an express agreement between co-conspirators or actual knowledge of the co-conspirator's act. *See United States v. Carter*, 560 F.3d 1107, 1113 (9th Cir. 2009) ("government need not establish that Carter had actual knowledge that guns would be used" in bank robbery because use of a gun was reasonably foreseeable); *United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011) ("'[*Pinkerton*] renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not.)" (internal quotation marks omitted)).

//

## 2.      Deprivation of Civil Rights – 18 U.S.C. § 242

Count 1 alleges deprivation of civil rights as an object of the conspiracy. The elements of deprivation of civil rights are as follows:

First, the defendant was acting under color of law when she/he committed the acts charged in the indictment.

Second, the defendant deprived Gerard Puana of his right to be free from unreasonable searches and seizures, which is a right secured by the Constitution or laws of the United States.

Third, the defendant acted willfully, that is, the defendant acted with a bad purpose, intending to deprive Gerard Puana of that right.

18 U.S.C. § 242; Pattern Jury Instructions of the Tenth Circuit No. 2.17 (2018).

## 3.      Obstruction of an Official Proceeding – 18 U.S.C. § 1512(c)(2)

Count 1 alleges obstruction of an official proceeding as an object of the conspiracy, and Counts 2, 3, 6, and 8 allege this crime as substantive offenses. The elements of obstruction of an official proceeding are as follows:

First, the defendant influenced, obstructed, or impeded, or tried to influence, obstruct, or impede an official proceeding by making false statements in the United States District Court for the District of Hawaii or before the Federal Grand Jury for the District of Hawaii; and

//

Second, the defendant acted corruptly, which means the act must be done with the intent to obstruct justice.[7]

An "official proceeding" includes a proceeding before a judge or court of the United States or a Federal Grand Jury.  18 U.S.C. § 1515.

Defendant Shiraishi has notified the United States that he intends to rely on a "perjury trap" defense to the obstruction charges.  As this Court has already held, even if the Ninth Circuit recognized such a defense (which it has never done), Shiraishi cannot raise it here.  *United States v. Kealoha, et al.,* Case No. CR 17-582-JMS-RLP, 2019 WL 847729, at \*4 (D. Hawaii Feb. 21, 2019) (citing *United States v. Chen,* 933 F.2d 793, 796 (9th Cir. 1991)).  Because a "perjury trap" defense is not available to Shiraishi, he should be precluded from raising evidence or argument concerning it before the jury.  *See United States v. Vasquez-Landaver,* 527 F.3d 798, 802 (9th Cir. 2008) ("a district court may exclude evidence on duress and may refrain from providing a jury instruction on duress where the defendant's proffer failed to make a prima facie showing of the required elements").

//

---

[7]     *See* Ninth Circuit Manual of Model Criminal Jury Instructions No. 8.131 (2010); *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007) (observing that the elements of § 1503 are analogous to the elements of § 1512(c)(2)); 18 U.S.C. § 1515 (definition of official proceeding); *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir. 1981) (definition of corruptly); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (not error to omit the words "evil" and "wicked" in instructions defining "corruptly" under section 1512(b)); Pattern Criminal Jury Instructions of the Seventh Circuit – 18 U.S.C. § 1512(c)(2) (2012).

Moreover, even if "perjury trap" was a recognized defense, and even if the facts plausibly supported such a claim here (and they do not), the jury would still not be entitled to decide this question of law. *See e.g., United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir. 1980) ("It was entirely proper for the district court to deny appellants' request that the question of outrageous misconduct be referred to the jury as that question was one of law."); *United States v. Gonzales*, 539 F.2d 1238, 1240 n.1 (9th Cir. 1976) ("The question of whether the agents' actions were a violation of due process was one of law, and properly determined by the district court. Appellant Gonzales' contention that the district court erred by failing to submit the question to the jury is therefore without merit."); *United States v. McQuin*, 612 F.2d 1193, 1196 (9th Cir. 1980) ("It was entirely proper for the district court to deny appellants' request that the question of outrageous misconduct be referred to the jury as that question was one of law."); *United States v. Gonzales*, 539 F.2d 1238, 1240 n.1 (9th Cir. 1976) ("The question of whether the agents' actions were a violation of due process was one of law, and properly determined by the district court. Appellant Gonzales' contention that the district court erred by failing to submit the question to the jury is therefore without merit.").

### 3.     False Statement to a Federal Officer – 18 U.S.C. § 1001

Count 1 alleges making a false statement as an object of the conspiracy, and Counts 9 and 10 allege this crime as substantive offenses. The elements of making a false statement are as follows:

First, the defendant made a false statement;

Second, the statement was made in a matter within the jurisdiction of the United States Postal Service (USPS) (Count 9), and the Federal Bureau of Investigation (FBI) (Count 10);

Third, the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful; and

Fourth, the statement was material to the activities or decisions of USPS or FBI; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

The false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material.  *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998); Ninth Circuit Manual of Model Criminal Jury Instructions No. 8.73 (2010).

### 4.      Altering and Falsifying Records – 18 U.S.C. § 1519

Count 1 alleges altering and falsifying records in an official proceeding as an object of the conspiracy.  The elements of altering and falsifying records in an official proceeding are as follows:

First, the defendant knowingly altered or falsified a record, document or tangible object;

Second, the defendant acted with the intent to impede, obstruct or influence

an actual or contemplated investigation of a matter within the jurisdiction of any department or agency of the United States.

The government need not prove that the defendant's sole or even primary intention was to obstruct justice so long as the government proves beyond a reasonable doubt that one of the defendant's intentions was to obstruct justice. The defendant's intention to obstruct justice must be substantial.

Ninth Circuit Manual of Model Criminal Jury Instructions No. 8.131A (2010).

B.   Trial Evidence

### 1.   Admission of Business Records Pursuant to Fed. R. Evid. 902(11)

The United States intends to admit business records—e.g., phone and email tolls, bank and other records—through declarations pursuant to Rule 902(11) and Rule 803(6). This comports with the rules of evidence and obviates the need to call various custodians to authenticate these records.

Specifically, Rule 803(6) states that a record is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness," if:

(A)   the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B)   the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)   making the record was a regular practice of that activity;

(D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or *by a certification that complies with Rule 902(11)* or (12) or with a statute permitting certification; and

(E)   the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

24

Fed. R. Evid. 803(6) (emphasis added). In turn, Rule 902(11) provides that the following is "self-authenticating":

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as *shown by a certification of the custodian* or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.[8]

*Id.* (emphasis added). As the Advisory Committee has explained, Rule 902(11) was designed to provide a procedure "by which parties can authenticate certain records of regularly conducted activity, other than through the testimony of a foundation witness." Fed. R. Evid. 902, Advisory Committee Notes (2000 Amendments).

Here, on February 7, 2019, the United States provided written notice under Fed. R. Evid. 902(11) of its intent to rely upon the certificates of authenticity produced in discovery to establish the authenticity and admissibility of records at

---

[8]     Admission of certified copies of business and public records has repeatedly been found to comply with the requirements of the Confrontation Clause. *United States v. Anekwu*, 695 F.3d 937, 974 (9th Cir. 2012) (foreign business records); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (public records); *see also Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 322-23 (2009) (recognizing that at common law a "clerk could by affidavit authenticate or provide a copy of an otherwise admissible record"). Moreover, the United States does not intend to introduce the actual declarations into evidence at trial, but simply to mark them for identification in the record. *See United States v. Hagege*, 437 F.3d 943, 958 n.6 (9th Cir. 2006) (finding no Confrontation Clause violation where records certifications were not themselves admitted into evidence).

trial. The bulk of the underlying records and certificates were provided to defense counsel on December 15, 2017 – nearly a year-and-a-half ago. Accordingly, the United States will seek to introduce these business records without calling various custodians to authenticate the records.

### 2. Admission of Public Records

Certified records of federal and state governments may be offered into evidence by the United States pursuant to Federal Rule of Evidence 902. These records are excepted from the hearsay rule by Rule 803(8), and so long as they meet the requirements of the Rule, their introduction does not require a sponsoring witness. *See United States v. Fryberg*, 854 F.3d 1126, 1135–36 (9th Cir. 2017) (explaining that for Confrontation Clause purposes, "[a] business or public record is not testimonial due to the mere possibility that it could be used in a later criminal prosecution," but based on whether "the *primary* purpose of the record is for use as evidence at a future criminal trial") (citation and quotations omitted).

### 3. Admission of Summary Charts of Voluminous Evidence

The United States intends to offer several summaries of voluminous evidence in accordance with Fed. R. Evid. 1006. Specifically, the United States will seek the admission of charts and summaries pertaining to phone communications between co-conspirators, geolocation data, and financial records.

Fed. R. Evid. 1006 states that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

The purpose of Rule 1006 "is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011) (citation omitted). The party offering the summary into evidence must establish that the "underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." *Id.* (citing *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996)). The underlying materials "must be admissible, but need not themselves be admitted into evidence." *Id.* (citing *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988)).

The Ninth Circuit has repeatedly approved of the use of Rule 1006 summaries, particularly where, as here, the summaries will aid in organizing information contained in numerous documents into understandable form. *See, e.g.*, *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (testimony concerning summaries of voluminous tax records permitted); *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary charts of telephone calls permitted to help jury organize and evaluate evidence); *Keith v. Volpe*, 858 F.2d 467, 479-80 (9th Cir. 1988) (summaries necessary to present relevant facts in government agency files);

Here, the United States intends to admit Rule 1006 summaries including: (1) spreadsheets/charts reflecting calls/texts between co-conspirators; (2) spreadsheets/charts reflecting geolocation/cell site data; and (3) spreadsheets/charts summarizing financial records. *See, e.g.*, *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary charts of telephone calls permitted to help jury organize and evaluate evidence).[9] These charts summarize data from various grand jury returns, containing thousands of pages of data.

### 4.   Contracts, Trusts, Checks and Legal Documents Are Admissible

At trial, the United States intends to offer into evidence a significant number of agreements, contracts, checks, and other legal documents which are relevant to this case. These types of documents are not subject to hearsay objections.  It is well-settled that signed instruments such as contracts, agreements, checks, and promissory notes are writings that have independent legal significance, and are non-hearsay.   *United States v. Rubier*, 651 F.2d 628 (9th Cir. 1981); *Kepner-Tregnoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994).   Signed instruments are verbal acts, which have legal reality independent of the truth of any statement contained in them. The fact that a party signs a legal document creates

---

[9]   Any challenges to the information included or not included in summary charts bears on the weight, not admissibility, of the exhibit. *See Rizk*, 660 F.3d at 1131 n. 2 (citing *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999) ("Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not to the admissibility of the evidence")).

legal rights, regardless of what the signatory was thinking at the time. *Kepner-Tregnoe, Inc.*, 12 F.3d at 540. Therefore, the admission of these types of documents to prove their existence cannot be prevented by the hearsay rule.

### 5.    Evidence Regarding Alison Lee Wong

The United States previously moved to admit evidence regarding K. KEALOHA's alias, Alison Lee Wong. *See, e.g.*, ECF Nos. 389, 438. At the motion *in limine* hearing, the Court found Alison Lee Wong—the purported notary of Gerard's trust document—was "critically important motive evidence." ECF No. 551-3 at 46.  Accordingly, the Court ruled it would permit the United States to present evidence of Alison Lee Wong, so long as the United States proved the alias without "proving up the Taito fraud and the bank fraud." *Id.* The Court further instructed, "before the government tries to do so it needs to clear it with me first." *Id.* "I am opening the door, if you can, and again, I don't know your evidence, so I don't know if you can, to prove up that Ms. Kealoha had this alias she used in other instances, therefore it shows the Alison Lee Wong notary in the trust document was in fact Ms. Kealoha." *Id.* at 46-47.  As outlined below, the United States *can* prove the Alison Lee Wong alias without proving up the Taito fraud and bank fraud.

At trial, the United States will establish that Alison Lee Wong is not a registered notary in the State of Hawaii.  Indeed, K. KEALOHA's own attorneys learned from the Hawaii Attorney General's Office that "the Attorney General is unable to locate any notary with the same or similar name to that on [Gerard's] trust

document."[10] *See* ECF No. 438 at 5-6. Despite that, the United States will prove that in May 2008, an order was placed with the American Association of Notaries ("AAN") under the email alisonleewong@yahoo.com. The product ordered was one Hawaii Notary Seal Embosser with the name "Alison Lee Wong." According to the order form, the "First Name" associated with the order was "Director," the last name was "c/o Kathryn Aloha," and the "Company Name" was "OEQC" (i.e., the Office of Environmental Quality Control).[11] During this time period, K. KEALOHA was the director of the OEQC. And the State of Hawaii has confirmed that the OEQC has never employed an "Alison Lee Wong."[12]

---

[10]     While testifying during the civil trial, K. KEALOHA stated she had "never seen" the trust document notarized by Alison Wong. But the United States will prove at trial that K. KEALOHA provided that exact document—with Alison Lee Wong's signature—to a title company in March 2009 as part of the Greenwood purchase.

[11]     As the United States previously outlined, *see* ECF No. 438 at 9, Alison Lee Wong drafted a letter of recommendation in support of K. KEALOHA's nomination to Director of the OEQC.

[12]     The United States will prove K. KEALOHA was the user of alisonleewong@yahoo.com, with evidence including:
- Subscriber information from Yahoo! reflects that an "alternative communication channel" for alisonleewong@yahoo.com is toandfrompepper@yahoo.com – K. KEALOHA's known email address.
- Account information from Yahoo! reflects that the Registration IP address for alisonleewong@yahoo.com belongs to the City and County of Honolulu. Moreover, the account was repeatedly logged into from the City and County's IP address. The City and County has confirmed they have no employee by that name. They did, however, employ K. KEALOHA.

The United States also intends to admit business records from Facebook for the user account "Alison Leewong." According to those records, "Alison Leewong"

The United States will also introduce several prior sworn admissions by K. KEALOHA regarding Alison Lee Wong. For example, in 2014, K. KEALOHA testified under oath that she knew one person named Alison Wong, and that she had last seen Wong in 2008 or 2009, at "Home Depot." That is directly contradicted by evidence establishing that Wong—purporting to be K. KEALOHA's assistant—contacted several individuals between 2010 and 2012 on K. KEALOHA's behalf.

This includes James Bickerton, K. KEALOHA's co-counsel for the Taitos. The United States intends to call Mr. Bickerton to testify narrowly to Alison Lee Wong's contact with him (on K. KEALOHA's behalf) while Mr. Bickerton was attempting to obtain information from K. KEALOHA related to a legal matter.[13]

At trial, the United States will also introduce evidence of K. KEALOHA's attempts to implant memories of "Alison Lee Wong" in the minds of several individuals. For instance, *after* the grand jury returned the initial indictment in this case, K. KEALOHA mailed a letter to an individual previously interview by the United States about Wong. K. KEALOHA's letter begins, "I'm asking for 10 minutes of your time." It then proceeds to seek to convince the recipient that the charges against KEALOHA were "WRONG!" As to Wong, the typed letter states, "They claim that Alison Lee-Wong is not a real person. At least a hundred people

---

used the same electronic device to log into Facebook as K. KEALOHA's daughter and brother.

[13]   The United States need not, and will not, elicit specific testimony regarding the Taitos from Mr. Bickerton, unless the defense opens the door to such testimony.

from my Arbonne group met her and even more people worked with her on the HI

Law Enforcement Memorial Foundation Gala in Dec. of 2010." Then, handwritten

into the margin of the page, K. KEALOHA wrote, "I know you met her!"



> 4- They claim that Alison Lee-Wong is not a real person. At least a hundred
> different people from my Arbonne group met her and even more people worked
> with her on the HI Law Enforcement Memorial Foundation Gala in Dec of 2010.
>
> *I know you met her!*

This witness has confirmed she has no memory of meeting Alison Lee Wong.[14]

### 6.    The Rule of Completeness

A defendant may not rely on the "rule of completeness" codified in Fed. R.

Evid. 106 to admit his own self-serving oral statements. *See United States v. Liera-*

*Morales*, 759 F.3d 1105, 1110 (9th Cir. 2014); *United States v. Vallejos*, 742 F.3d

902, 905 (9th Cir. 2014); *United States v. Collicot*, 92 F.3d 973, 983 (9th Cir. 1996).

When a writing or recorded statement (or any part thereof) is introduced by a party,

Rule 106 allows for the admission by the adverse party of any other part or any other

written or recorded statement which ought in fairness to be considered

contemporaneously with it.  Application of the rule of completeness is a matter of

the trial court's discretion.  *United States v. Dorrell*, 758 F.2d 427, 434 (9th Cir.

1985).  The rule, however, is limited to writings and recordings and does not apply

to oral conversations.  *See* Advisory Committee's Notes on Fed. R. Evid. 106.  The

---

[14]    The defense has included "Allison Lee Wong" of Honolulu, Hawaii, on their witness list.

Ninth Circuit has held that the rule of completeness does not require admission of otherwise inadmissible hearsay where the prosecution played two excerpts from defendant's jail calls that were inculpatory and the district court denied defendant's request to play two separate calls denying his guilt. *See United States v. Meraz*, 2016 WL 6407431 (9th Cir. Oct. 31, 2016) (unpublished). The Ninth Circuit reaffirmed that the self-inculpatory statements the government introduced were admissible by a party-opponent and were not hearsay (Fed. R. Evid. 801(d)(2)), the non-self-inculpatory statements the defendant offered were inadmissible hearsay. *Id.* (citing *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (citations omitted)).

Here, the United States intends to introduce oral and written statements, including such statements made by defendants during prior hearings, depositions, testimony in various proceedings, and in written reports.  Defendants cannot rely upon the rule of completeness to bootstrap other self-serving statements made by defendants in order to avoid exclusion under the hearsay rules.

### 7.    Hostile Witness or Witness Identified with an Adverse Party

Several of the witnesses called by the United States will be close friends and associates of the defendants.  During the testimony of such witnesses, the United States may request permission to conduct the examination using leading questions, as permitted by Rule 611(c) of the Federal Rules of Evidence.

Rule 611(c) provides that "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading

33

question." The Rule "vests broad discretion in trial courts." *Miller v. Fairchild Industries*, 885 F.2d 498, 514 (9th Cir. 1989). Reversal on the basis of an exercise of discretion under the Rule will occur "only if the judge's action amounted to or contributed to the denial of a fair trial." *Id.* "The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to the opposing party." Glen Weissenberger, *Federal Evidence 1996 Courtroom Manual* 134 (1995).

Before the adoption of Rule 611(c), the use of leading questions on direct examination required either a showing of actual hostility or a determination that the witness being examined was an adverse party, or an officer, director, or managing agent of an adverse party. *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir.1981). The drafters of the Rule decided that these limitations presented "an unduly narrow concept of those who may safely be regarded as hostile without further demonstration. Fed. R. Evid.611(c) Advisory Committee Notes. The new rule was thus designed to enlarge the categories of witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility." *Id.*

Rule 611(c) also states: "[O]rdinarily leading questions should be permitted on cross-examination." But as the Advisory Committee Notes make clear, the "right of a cross-examiner to employ leading questions is not absolute under Rule 611(c)." *Morvant v. Construction Aggregates Corporation*, 570 F.2d 626, 635, n.12 (6th Cir.

1978).  "Generally, when a witness identified with an adverse party is called, the roles of the parties are reversed.  Leading questions would be appropriate on direct examination but not on cross examination." *Alpha Display Paging v. Motorola*, 867 F.2d 1168,1171 (8th Cir. 1989).  The Advisory Committee Notes to Rule 611(c) state the use of the word "ordinarily" was meant to "furnish a basis for denying the use of leading questions when the cross examination is cross examination in form only and not in fact," giving the example of an insured defendant who proves to be friendly to the plaintiff.  In instances where the United States' witnesses are friendlier to Defendants, the United States would request that the Court require the defense to examine these witnesses by means of non-leading questions.

## 8.    Use of Evidence in Opening Statement

The United States anticipates that it will incorporate some exhibits (such as photographs, videos, and charts) in its opening statement.  Courts have approved the use of visual aids in opening statement since "the purpose of the opening argument is to give a broad outline of the case and facts to be proved, a visual outline of a party's argument is not significantly different from an oral outline." *United States v. Fried*, 881 F.2d 1077 (6th Cir. 1989). The visual aids obviously "must avoid reference to matters that cannot be proved or would be inadmissible as evidence." *United States v. De Peri*, 778 F.2d 963, 978-79 (3d Cir. 1985), *cert. denied sub nom*, *Murphy v. United States*, 475 U.S. 1110 (1986) (the trial court did not abuse its discretion in allowing the government to use a visual aid in its opening statement).

The United States will confer with defense counsel regarding the use of exhibits in opening statement. Should defense counsel question the admissibility of an exhibit the United States intends to use during its opening statement, upon identification of the exhibit and the basis for the objection, the United States will present the evidence to this Court for a pre-trial hearing to determine admissibility.

Dated: May 2, 2019                  Respectfully submitted,

                                    WILLIAM P. BARR
                                    United States Attorney General

                                    ROBERT S. BREWER, JR.
                                    United States Attorney

                                    */s/ Janaki S. Gandhi*
                                    MICHAEL G. WHEAT
                                    JOSEPH J.M. ORABONA
                                    JANAKI S. GANDHI
                                    COLIN M. MCDONALD
                                    Special Attorneys to the Attorney General

# UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE P. KEALOHA (1),<br>LOUIS M. KEALOHA (2),<br>DEREK WAYNE HAHN (3),<br>MINH-HUNG NGUYEN (4),<br>GORDON SHIRAISHI (5),<br><br>Defendants. | CR. NO. 17-00582 JMS-RLP<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Janaki S. Gandhi, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893.

I am not a party to the above-entitled action. I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 2, 2019.

/s/ Janaki S. Gandhi
JANAKI S. GANDHI