WILLIAM P. BARR
Attorney General
ROBERT S. BREWER, JR.
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI S. GANDHI, CBN 272246
COLIN M. MCDONALD, CBN 286561
Special Attorneys to the Attorney General
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144
michael.wheat@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>       v.<br><br>KATHERINE P. KEALOHA (1),<br>LOUIS M. KEALOHA (2),<br>DEREK WAYNE HAHN (3),<br>MINH-HUNG NGUYEN (4),<br>GORDON SHIRAISHI (5),<br><br>                  Defendants. | CR. NO. 17-00582 JMS-RLP<br><br>UNITED STATES' MOTION IN LIMINE TO ADMIT SUMMARY AND PEDAGOGICAL CHARTS; NOTICE OF WITNESS<br><br>Trial Date: June 17, 2019<br>Time: 8:30 a.m.<br><br>Hon. J. Michael Seabright |

The United States, through its counsel, Robert S. Brewer, Jr., United States Attorney, and Michael G. Wheat, Joseph J.M. Orabona, Janaki S. Gandhi, and Colin M. McDonald, Special Attorneys to the Attorney General, hereby files its Motion in Limine to Admit Summary and Pedagogical Charts and Notice of Witness.

I

MEMORANDUM OF POINTS & AUTHORITIES

The United States has prepared and provided to the defense counsel twenty charts and summaries of voluminous financial records related to this case (Ex. 36-1 through 36-20).[1] At trial, the United States intends to offer twelve of these charts into evidence, in accordance with Fed. R. Evid. 1006 and 611(a). These charts focus largely on the joint bank account held by Florence Puana and Katherine Kealoha ("the 1502 Account"), the purchase of the Greenwood condo, Gerard Puana's income and payments of "mortgage" and maintenance fees to Katherine Kealoha, and relevant financial records of Katherine and Louis Kealoha during the period between January 1, 2009 and December 31, 2014 (hereinafter the "relevant period"). There is no dispute as to the foundation for these exhibits as all business records have been previously produced to defense counsel in discovery and such records are otherwise admissible into evidence. Moreover, as FBI Forensic Accountant Laurice Otsuka's testimony will confirm, the summary charts are based on voluminous financial records. The apparent issue before the Court is whether the summary charts are relevant in this case.[2] The United States contends they are relevant.

---

[1] The United States has provided updated charts to defense counsel. While the Court has the near-final charts in its exhibit binders, the United States will file under seal with the Court the updated charts.

[2] The United States met and conferred with defense counsel in order to limit the number of charts brought to the Court's attention in this motion. However, the defense informed the United States that they object to all of the United States' charts.

### 1.   FBI Forensic Accountant Will Provide Lay Testimony

During the meet and confer, defense counsel informed the United States that they intend to object to the testimony of FBI Forensic Accountant Laurice Otsuka as expert testimony – despite the Court overruling this objection during the motions in limine hearing in May 2019.  As stated previously, the district court does not need to certify the forensic accountant as an expert to testify as to the methods used to prepare the summary charts and to testify as to the content of the financial information she summarized from her review of the voluminous records. *See United States v. Aubrey*, 800 F.3d 1115, 1129 (9th Cir. 2015).  In *Aubrey*, the defendant claimed that the district court was required to certify the HUD auditor as an expert because of his use of the accounting method "last-in-first-out" in preparing his summary charts.  *Id.* at 1129.  The district court disagreed and found that the testimony was lay opinion testimony under Rule 701 because it was based upon the auditor's personal knowledge and investigation.  *Id.*   In addition, the district court noted that the auditor was subject to cross-examination as to the content of his charts. *Id.*  The district court restricted the testimony of the auditor to the areas in which he had personal knowledge (the documents, his investigation, and the methods he used to prepare his summary charts) and prevented him from providing an in-depth analysis of various accounting methods.  *Id.*   Although the auditor made two passing references to the "last-in-first-out" method, the Ninth Circuit held that was

insufficient to require the district court to certify him as an expert witness. *Id.* (quoting *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) ("the fact that Zeitz might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about hose lost profits could be calculated from the data contained therein.").

Similar to the auditor in *Aubrey*, FBI Forensic Accountant Laurice Otsuka will testify based upon her personal knowledge of the facts contained in the voluminous financial records which she analyzed in this case. Such personal knowledge includes her investigation and tracing of funds through the accounts summarized in her charts. Ms. Otsuka will testify about her own personal investigation in her capacity as the FBI Forensic Accountant in accordance with Federal Rule of Evidence 701. Based upon her training and experience, Ms. Otsuka will also explain accounting and finance terms. These terms are within her personal knowledge as a forensic accountant for more than seven years, a manager and vice-president of several banks for approximately six years, a controller and accounting director for approximately eight years, a mortgage loan officer for approximately three years, and a tax auditor for approximately five years. Ms. Otsuka has been a Certified Public Accountant (CPA) for approximately thirty years. As such, she is qualified to provide lay opinion testimony concerning the financial information summarized in her charts.

## 2. Relevance and Admissibility of the Summary Charts

Under Rule 401, relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. This is a "low bar." *United States v. Lloyd*, 807 F.3d 1128, 1152 n.6 (9th Cir. 2015) (quoting *United States v. Cloud*, 680 F.3d 396, 402 (4th Cir. 2012)). "To be 'relevant,' evidence need not be conclusive proof of a fact sought to be proved, or even strong evidence of the same." *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc). All that is required is a "tendency" to establish a fact at issue. *Id.*

Rule 1006 of the Federal Rules of Evidence states that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006.

The purpose of Rule 1006 "is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011) (citation omitted). The party offering the summary into evidence must establish that the "underlying materials upon which the summary is based (1) are admissible in

5

evidence and (2) were made available to the opposing party for inspection." *Id.* (citing *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996)). The underlying materials "must be admissible, but need not themselves be admitted into evidence." *Id.* (citing *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988)). The district court is within its discretion to admit both the summary chart and underlying records into evidence, especially where the jury would have a difficult time calculating the inflows and outflows of an account and the bank records have additional probative value which is not captured in the chart. *See United States v. Anekwu*, 695 F.3d 967, 981-82 (9th Cir. 2012).

The Ninth Circuit has repeatedly approved of the use of Rule 1006 summaries, particularly where, as here, the summaries will aid in organizing the information contained in a large number of documents into understandable form. *See, e.g.*, *Anekwu*, 695 F.3d at 981-82 (testimony concerning summaries of voluminous bank records); *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (testimony concerning summaries of voluminous tax records permitted); *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary charts of telephone calls permitted to help jury organize and evaluate evidence); *Keith v. Volpe*, 858 F.2d 467, 479-80 (9th Cir. 1988) (summaries necessary to clearly present relevant facts in United States agency files).

The following summary charts are admissible under Rules 401 and 1006:[3]

- Ex. 36-1: List of Financial Accounts of Katherine and Louis Kealoha from January 1, 2009 – December 31, 2014.

    o   This summary chart is relevant as it provides a list of checking and saving accounts, loans, and credit cards to refute the statement made by Katherine Kealoha to USPIS Special Agent Brian Shaughnessy while preparing for trial in 2014 that she had only one bank account, one credit card, and one mortgage. This chart shows that Katherine and Louis Kealoha had 15 bank accounts and 13 loans and credit cards in 2014.

- Ex. 36-2: Chronological History of the 1502 Account

    o   This summary is relevant as it details the chronological history of the deposits and withdrawals from the 1502 account where the

---

[3] Summaries and charts may also be used at trial as pedagogical devices. Fed. R. Evid. 611(a). Rule 611(a) permits the use of charts and summaries of testimony and documents already admitted into evidence as testimonial aids. *See United States v. Olano*, 62 F.3d 1180, 1203 (9th Cir. 1995). The district court has discretion to admit pedagogical summaries into evidence and to submit them to the jury during deliberations accompanied by a limiting instruction. *See United States v. Aubrey*, 800 F.3d 1115, 1130-31 (9th Cir. 2015) (citing *United States v. Anekwu*, 695 F.3d 967, 981-82 (9th Cir. 2012). The Ninth Circuit has found no abuse of discretion where summary charts were admitted in evidence. *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (tax evasion); *United States v. Johnson*, 460 F.2d 20, 22 (9th Cir. 1972) (per curiam) (holding that the trial court did not err when it admitted chart which "simply summarized a series of exhibits which had been previously introduced into evidence without objection"); *see also* Ninth Circuit Model Jury Instruction No. 4.16 (2015).

reverse mortgage funds were deposited and spent. This chart is chronological by date, as provided on the bank statements, starting on February 27, 2009 and continuing up to the closing date of January 24, 2013.

- o   This summary is also relevant because it shows the funds from the reverse mortgage were depleted by April 19, 2010, and afterward, the deposits made into the account primarily came from Gerard K. Puana from June 2010 through October 2012.

- Ex. 36-3: The Sources and Uses of Funds from the 1502 Account
    - o   This chart is relevant as it summarizes the financial information in the 1502 account by the sources of funds deposited into the account versus the uses of funds. It shows that a total of approximately $540,000 was deposited into the 1502 account, primarily from the reverse mortgage of $513,000. It also shows that a total of approximately $540,000 was spent on various items, such as the Greenwood condo, Sheraton Waikiki, Mercedes Benz, Elton John tickets, Maserati, Disneyland, and other personal items. This chart shows that funds used from the account were not spent to consolidate debt or obtain a second mortgage on the Kealaolu residence.

- <u>Ex. 36-4</u>: The Bank Statement Mailing Addresses for the 1502 Account

    o   This chart is relevant because it summarizes the mailing addresses from each of the bank statements for the 1502 account from inception in 2009 through closing in 2013. The chart shows that initial mailing address was 1018 Kealaolu from March 2009 through August 2011. The mailing address for the bank statements was changed to 4348 Waialae Avenue, #234 (P.O. Box) from September 2011 through January 2013.

- <u>Ex. 36-5</u>: Cash and Cashier's Check Withdrawals from the 1502 Account

    o   These schedules are relevant to show some of the tracing of the $59,000 in cash taken out of the 1502 Account by Katherine Kealoha and spent on various personal items. For example, Schedule A shows that Katherine Kealoha took funds from the reverse mortgage and used them to pay Gerard Puana his alleged investment return from the *hui*. Also, Schedule B shows that Katherine Kealoha used the reverse mortgage funds as a down payment for a Maserati.

    o   The schedules and flow charts trace the funds from the reverse mortgage and show that the funds were spent by Katherine Kealoha, and not Florence Puana. The schedules also show that the reverse mortgage funds were not used by Katherine Kealoha

9

to consolidate her and Louis Kealoha's debts; but rather, to incur new debts and make new purchases.

- Ex. 36-6: Reverse Mortgage Proceeds and Greenwood Purchase

    o   This chart is relevant to show a summary of the escrow proceeds and costs for the Greenwood condo purchase. It accounts for $15,800 owed to Katherine Kealoha for prepaid rent on the Greenwood condo (which is detailed in Ex. 36-7).

    o   The chart underneath the escrow proceeds and costs shows that the net proceeds of approximately $153,000 (which ties to the above escrow analysis) was used by Katherine Kealoha on cash/cashier's checks and personal expenses.

- Ex. 36-7: Total Owed to Katherine Kealoha from Greenwood Purchase

    o   This chart is relevant to show the amount of prepaid rent deposited into the escrow account by Katherine Kealoha between February 2009 and July 2009, totaling $15,800. It also accounts for the initial deposit made by Katherine Kealoha of $1,000 upon opening the 1502 Account. Lastly, although it has been disputed, the chart conservatively gives credit of approximately $1,100 paid by Katherine Kealoha for furniture that may have been provided to furnish the Greenwood condo.

- o   This chart also shows that Katherine Kealoha is only due a reimbursement of $17,910.60 from the Greenwood purchase; not the $83,000 that Katherine Kealoha claimed and stated in the tax affidavit that she drafted for Florence Puana (and which was admitted as Defense Exhibit 1022 over the United States' objection).

- Ex. 36-8: Comparison between Greenwood Reports and 1502 Account

  - o   This chart is relevant to show the difference between what Katherine Kealoha was paying to Greenwood for the condo expenses and what Gerard Puana was paying to Katherine Kealoha for his alleged mortgage and maintenance fees.

- Ex. 36-9: Gerard Puana Income from Workers' Compensation

  - o   This chart is relevant to show the amount of monthly income Gerard Puana's received in workers' compensation from the Department of Labor. This chart corroborates how Gerard Puana was able to "invest" substantial funds in Katherine Kealoha's investment hui.[4] It also defines the source of the money he used to pay the alleged mortgage and maintenance fees to Katherine Kealoha for the Greenwood condo.

---

[4] On cross examination, defense counsel questioned how Gerard Puana—unemployed and residing with his mother—could possibly have access to the amount of money he claimed he gave over to Katherine Kealoha. Exhibit 36-9 makes clear Gerard Puana brought in sufficient money to support his claims.

11

- Ex. 36-11:  Greenwood Commission of $7,000

    o   Terry Ewart previously testified that she gave Katherine Kealoha a portion of her commission ($7,000) for the Greenwood condo purchase. Ewart then testified that Katherine Kealoha returned the $7,000 to her, not wanting to take any of her grandmother's money. Exhibit 36-11 traces the flow of the $7,000. Specifically, the chart shows (1) that Katherine Kealoha deposited the $7,000 from Ewart into Kealoha's personal bank account, and (2) thereafter, Katherine Kealoha took funds from the reverse mortgage in the 1502 Account (i.e., belonging to Florence Puana) and allegedly "returned" the $7,000 commission to Terry Ewart.

- Ex. 36-14: The Sources and Uses of Funds by Katherine and Louis Kealoha (combined all accounts) from January 1, 2009 to December 31, 2014

    o   This summary chart is relevant to compare the sources and uses of funds without accounting for approximately $139,000 in net proceeds from the reverse mortgage.  This chart shows that the total amount of disbursements exceeds the other sources by approximately $139,000 – which was used to fund personal expenses as previously described.

    o   This summary chart also accounts for the comparison on a year-by-year basis as the reverse mortgage funds were spent.  It also

shows that the Kealoha's were living beyond their means and their legitimate sources of income.

- Ex. 36-18: Louis and Katherine Kealoha's Second Mortgage

    o This summary chart traces the flow of funds from the second mortgage obtained by Louis and Katherine Kealoha on their Kealaolu residence in July 2012. The chart is relevant to show the timing of the second mortgage, which is three years after the reverse mortgage funded and is two months before the correspondence between Florence Puana and Katherine Kealoha (Exhibits 1-9 and 1-10).

### 3. Other Charts

The United States does not intend to use the following summary charts during the direct examination of Ms. Otsuka, unless made otherwise relevant during cross-examination of Ms. Otsuka:[5]

- Ex. 36-10: The Verification of Assets in Gerard K. Puana's Purported Revocable Trust

- Ex. 36-12: Gerard Puana's Investments and Returns from Katherine Kealoha's Arbonne Account

---

[5] The United States reserves the right to request the Court's review and admission of these charts should they become relevant during or after the defendants' cases-in-chief.

13

- <u>Ex. 36-13</u>: Summary of Katherine Kealoha's Arbonne Account

- <u>Ex. 36-15</u>: Summary of Katherine and Louis Kealoha's American Savings Bank Account

- <u>Ex. 36-16</u>: Summary of Katherine and Louis Kealoha's Hawaii USA FCU Account

- <u>Ex. 36-17</u>: Summary Chart of Katherine Kealoha's First Hawaiian Bank Account

- <u>Ex. 36-19</u>: Summary of Katherine Kealoha's Bank of Hawaii Acocunt for the OEQC

- <u>Ex. 36-20</u>: Summary of Katherine Kealoha's Bank of Hawaii dba Arbonne Account

### 4.  **Workers' Compensation is Nontaxable Income**

During the cross-examination of Gerard K. Puana on June 5, 2019, defense counsel questioned whether Mr. Puana had filed tax returns reporting his workers' compensation income. Mr. Puana responded that he had not filed tax returns. This testimony has left the jury with the misimpression that Mr. Puana was required to file tax returns and report the gross income he earned from workers' compensation. However, under the 26 U.S.C. § 104(a)(1) and 26 C.F.R. § 1.104-1(b), amounts received under workers' compensation are excluded from gross income and are nontaxable. As such, to correct this misimpression, the United States hereby provides notice of its intent to have As such, to correct this misimpression, the

United States hereby provides notice of its intent to have IRS Special Agent Mark MacPherson testify to the fact that workers' compensation is nontaxable, and thus not reported on a tax return. In addition, Special Agent MacPherson will testify to the fact that a person whose sole income is from nontaxable workers' compensation does not have to file a tax return. Special Agent MacPherson may also testify that the "tax clarification affidavit" admitted over the United States' objection as Defense Exhibit 1022 is not a usual tax document (indeed, SA MacPherson has never seen such a document), and that the information contained with Defense Exhibit 1022 is inconsequential to any possible tax issues. These facts do not constitute expert testimony. They are simply facts known by Special Agent MacPherson as part of his work with the Internal Revenue Service.

Respectfully submitted,

Dated: June 12, 2019

WILLIAM P. BARR
United States Attorney General

ROBERT S. BREWER, JR.
United States Attorney

*/s/ Joseph J.M. Orabona*
MICHAEL G. WHEAT
JOSEPH J.M. ORABONA
JANAKI S. GANDHI
COLIN M. MCDONALD
Special Attorneys to the Attorney General

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>KATHERINE P. KEALOHA (1),<br>LOUIS M. KEALOHA (2),<br>DEREK WAYNE HAHN (3),<br>MINH-HUNG NGUYEN (4),<br>GORDON SHIRAISHI (5),<br><br>　　　　　Defendants. | CR. NO. 17-00582 JMS-RLP<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Joseph J.M. Orabona, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893.

I am not a party to the above-entitled action. I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 12, 2019.

　　　　　　　　　　　　　　　　　　*/s/ Joseph J.M. Orabona*
　　　　　　　　　　　　　　　　　　JOSEPH J.M. ORABONA